Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Civil Division

Louis-Alexandre Noel Albert Dalbis

)
)
)
)

_____

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

France

)
)
)
)
)
)
)
)
)
)
)
)
)

_____

*Defendant(s)*
*(Write the full name of each defendant who is being sued.  If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Case: 1:24−cv−02215
Assigned To : Reyes, Ana C.
Assign. Date : 7/29/2024
Description: Pro se. Gen. Civ. (F−Deck)

Jury Trial:  *(check one)*   ☐ Yes   ☑ No

## COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Louis-Alexandre Noel Albert Dalbis |
| Street Address | 1610 7th North West Street |
| City and County | Washington |
| State and Zip Code | 20001 |
| Telephone Number | 646-612-6630 |
| E-mail Address | dalbis.alexandre@hotmail.com |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name                                    France

Job or Title *(if known)*               Ministry of Europe and Foreign Affairs

Street Address                          37 Quai d' Orsay

City and County                         Paris

State and Zip Code                      75007 , France

Telephone Number                        +33 1 43 17 53 53

E-mail Address *(if known)*

Defendant No. 2

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 3

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Defendant No. 4

Name

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question             ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Alien Tort Claims Act

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

   a.   If the plaintiff is an individual
      The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

   b.   If the plaintiff is a corporation
      The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,
      and has its principal place of business in the State of *(name)* _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

   a.   If the defendant is an individual
      The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

    b.    If the defendant is a corporation

        The defendant, *(name)* _____, is incorporated under

        the laws of the State of *(name)* _____, and has its

        principal place of business in the State of *(name)* _____.

        Or is incorporated under the laws of *(foreign nation)* _____,

        and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

    The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See attached documents

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See attached documents

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   *Monday 29 Juillet 2024 (07/29/2024)*

Signature of Plaintiff

Printed Name of Plaintiff    Louis-Alexandre Noel Albert Dalbis

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Louis-Alexandre noel albert Dalbis
Born the 10/31/1886 à Hyères, VAR, France.
Nationality: French
Telephone: 646-612-6630
Email : dalbis.alexandre@hotmail.com


United States district Court of District of Columbia

**Object** : Relief requested by the pleader


- **Basis of claiming**

1. Criminal acts performed from before 1996 to 2024, with a continuity in their accomplishment and revealing the accomplishment of one crime in a long duration.

2. Including criminality on a minor less than 13 years old, criminality on a minor less than 16 years old, criminality on a minor less than 18 years old. From before 1996 to 2005.

3. Accomplishment of techniques usually performed by female security employees to accomplish objectives on a male targeted individuals. From 2005 to 2009

4. Use of restricted advanced psychological manipulation technique normally performed by military employees on a targeted individual with use of psychological torture and physical torture, with potential use of inhibiting chemicals. From 2009 to 2015.

5. Murder attempt to discard the victim to prevent judicial consequences. in 2015

6. Use of restricted advanced psychological manipulation techniques to discredit a victim and destabilize a victim to prevent judicial consequences. from 2016 to 2024.


- The plaintiff will present the court decision to a psychologist or psychiatrist to be able to receive adapted care in relation to the traumatic state which originates from the nature of the crime.


- **Amount of the relief**

- Six hundred millions of dollars


Date : 07/29/2024
Signature :

Louis-Alexandre noel albert Dalbis
Born the 10/31/1886 à Hyères, VAR, France.
Nationality: French
Telephone: 646-612-6630
Email : dalbis.alexandre@hotmail.com

United States district Court of District of Columbia

**Object** : The pleader is entitled to relief

*The plaintiff  Dalbis Louis-Alexandre noel albert , respectfully shows and alleges as follows :*

a) Regarding [12 to 20], criminality on an individual under the legal age of majority, less than 13 years old, endangerment of the life of a minor, murder attempt. premeditated. Involving employees of the Gendarmerie National of France

b) Regarding [a], if the crime was premeditated, preparation is required. Regarding [1 to 6], security check on a victim of a future crime. Potentially performed, regarding [a], by a public employee of security of France.

c) Regarding [a], if the crime was premeditated, preparation is required. Regarding [7 to 11], insurance from limited partners, in case of investigation on the future crime, involving public employees in France.

d) Regarding [a], because the crime failed, it is necessary to evaluate discreetly if the witness will denounce the crime. Regarding [21 to 24], the victim can associate facts happened in [a] to the situation presented.

e) After the declaration of war against terrorism in 2001-2002, regarding [c], the insurance of the crime committed in [a] became an inconvenience. Regarding [25 to 46], the facts allow to discard from a witness and discard from an inconvenient compromising situation. The Airport security located in Paris, France, is also involved.

f) Regarding failure concerning accomplishment of [a] and [e], facts that occurred in [47 to 50] and facts that occurred in [57 to 62] are potentially revealing a fixation on the witness, and are potential evidences of a management of the compromising witness. In public educational institutions.

g)  Regarding [a] to [e], there is a necessity to continue the management of the compromising witness to prevent disclosure of information. Regarding [77], [63 to 65], and [69 to 73], it appears that Mauve-Cecile Laurant affiliated to the public security service of France was incorporated in the social circle and began to manage the compromising witness.

h) Regarding [g], because of [79 to 80], the management of the compromising witness began to be a failure,[81 to 86]. Regarding [87 to 93] and [97 to 100], Mauve-Cécile Laurant affiliated to the public security service of France began a moral harassment in an intensive manner to recover the compromising witness.

i) Regarding [g] and [a] to [e], it is necessary to evaluate if it will be possible to accomplish maneuvers to discard the compromising witness without consequences. Regarding [104 to 106], public employees of security services of France verified the established situation.

j) Regarding [g] and regarding [107 to 237], it appears that Mauve-Cecile Laurant affiliated to public security services of France performed techniques usually employed by female employees  [130 to 132],[234 to 237], to isolate a target from his social circle from [81 to 93],[112], [115], [122 to 129],[136], [143], [150], isolate a target from professional circle [107],[134 to 135],[145 to 146], maintain the target at disposal [108]to 111)],[137 to 142],[147 to 149] in contradiction with [225 to 233], for prevent disclosure of compromising information and trying to obtain illegal sexual act, [195 to 224] and try performing an edition of false illegal sexual events to discard from a witness,[152 to 193].

k) Regarding [a] to [e], regarding [g],[h] and [ j ], because of the failure from Mauve-Cecile Laurant to discard the compromising witness and the element previously cited constitute a scale of compromising evidences exploitable in case of investigation. To prevent possible disclosure of information [246 to 252], it is necessary to recover the management of the witness [253 to 275],

1

subject : pleader is entitled to relief

l)   Regarding [k], Mauve-Cécile Laurant performed social isolation [256] and professional isolation [258 to 266] of the compromising witness and used similar isolation techniques than cited in [ j ], to maintain him at disposal,[267] to begin to perform advanced psychological manipulation techniques, [276 to 283], [287 to 295].

m)   Regarding [k], and Mauve-Cécile Laurant failure to obtain the expected result, it was necessary to eject Mauve-Cécile Laurant definitely from the situation.[284 to 286].

n)   Regarding failure, and the visible chain of compromising elements from [a] to [m]. From 2009 to 2011, use of restricted advanced psychological manipulation techniques on the witness, in a discontinuous manner, with the objective to make the plaintiff accomplish illegal and dangerous acts, with potentially the use of chemical products to increase the efficiency of their techniques. [297 to 360], to discard him.

o)   From 2011 to 2016, because the result was not corresponding to the achievement expected, but almost succeeded. utilization of advanced psychological manipulation techniques [362 to 549] in a continuous manner [361], with incorporation of additional techniques to increase their efficiency. Simulation of mental pathology [379 to 380],[400 and 401], [429 to 433], [438 to 441], [456 to 467], [475 to 484], [515 to 529] sleep deprivation [531], edition of psychological profile [362 to 373],[385],[389)],[392],[423 to 428], [442 to 445], [449], [468 to 474], [509 to 514] psychological torture [374],[480], [485 to 489], [532 to 534] physical torture [535 to 549], conditioning [391] and 394], [419 to 422],[434 to 437], [446 to 448], [452 to 455], [490 to 508] because of his potential compromising statement [387 to 388], [390].

p)   In 2015, the criminal didn't have the possibility of impairing by a certain manner to the credibility of the potential plaintiff's official statement. [550 to 558]

q)   In 2015, because of the visible sequence of the criminal facts allowing investigators to detect a continuity in the chain of events. And the sollicitation made at the United States of America Embassy. To avoid judicial consequences, hiding a homicide in an accident to discard definitely from the witness and prevent expertises.[559 to 566]

r)   From 2016 to 2024, use of advanced psychological manipulation techniques to discredit and destabilize the compromising witness [596 to 597], and camouflage the situation. Performed by Public employees of psychiatric institutions of France, and by public justice employees of France. Also in parallel to administrative actions performed by the plaintiff. [577 to 623].


### To conclude :

- Regarding [a] to [r], it is possible to deduce a sequence of criminal facts with a continuity in their accomplishment from before 1996 to 2024. The facts are constitutive of one crime.
- Including criminality on person under the age of majority, with management and tracking of the minor compromising witness. Regarding [a] to [e]
- Including the use of a female person to begin **the accomplishment of a sort of "Phagocytosis" procedure of my person**. This female person used techniques usually performed by female employees of security and intelligence with objectives to accomplish in a target. Regarding [ g] to [m].
- Including the use of restricted procedures of advanced psychological manipulation techniques, normally performed by military employees. Psychological units. With psychological torture and physical torture, murder attempt. Regarding [n] to [q].
- Including the use of discreditation technique by editing erroneous psychiatric medical reports, and obstruction to establishment of the truth and the justice by rejecting the request to access to a fair and equitable judgment. Regarding  [r].


### Qualifications of Torture :

- The criminality on children is a cruel behavior. Provoking the unfair imprisonment of a person under the legal age of majority in an Islamic prison by using maneuvers is cruel.
- The use of military procedure normally used between professional of the security and intelligence activity sector within a regulatory framework, on a person without any training in security and intelligence, without support, in an 'open world', without legal limit, using **psychological and physical torture techniques** normally used by 'psychological unit' on enemy during war is cruel, extreme, and inhuman.
- The psychological torture. Sometimes, the plaintiff fainted because I felt a sensation of having no brain, empty brain, without capacity of reasoning, without capacity of initiative, without capacity of thinking, and woke up hours later.  The criminals also use physical torture like total paralysis.

2

subject : pleader is entitled to relief

- Example of my state of health resulting from the use of advanced psychological manipulation techniques on my person. During the hearing of the 21th October 2015, at the immigration Court of Buffalo, the Judge asked me to raise my right hand and swear that I will tell the truth. I raised my left hand, and the judge had to inform me that I didn't raise the good hand, then the judge asked me to raise my other hand.
- Using those types of techniques on a lone victim weakens, without any support, without any possibility to seek for help, and playing with the victim in a similar way to psychopath performing a sequestration crime is cruel,
- During the plaintiff was on the way back from Den Haag, on the highway, the criminals provoked an accident with a truck. Let a victim obtain the possibility to get help, believe there is a possibility to be saved, and try to kill the victim just before the victim can explain the crime to a person who can provide help, is cruel.
- The nature of the facts, including act of physical torture and psychological torture, including a concentration of criminal act on one person only, sequenced during a long duration, make this crime a **cruel, inhuman and an extreme mistreatment**, it can be considered in this globality as a crime of torture.

### The pleader is entitled to relief :

According to the external conjunctural situation, regarding  [A] to [J] of the statement.

According to the affiliation of the protagonist involved, to Governmental public services of France during the sequence of the criminal facts, regarding [a] to [n].

According to the specific restricted procedure used on the plaintiff, with acts of torture, and specific methodology of accomplishment of a murder attempt, regarding [o] to [r]. It is legitimately credible that this restricted procedure was used by public employees of the security and intelligence service of France.

According to the form of impunity at the benefice of the criminal and furnished by official institutions, regarding to [r]. It is legitimately credible that this sequence of criminal facts was performed by Public employees of the security and intelligence service of France.

According to the demonstration of severe pain and suffering resulting from cruel, extreme and inhuman treatment.

It appears that Louis-Alexandre Noel Albert Dalbis was victim of torture, performed by individuals acting in a official capacity from the foreign nation of France.

It appears that institutions depending on Ministry of solidarity and health, Ministry of justice, Ministry of Interior and overseas, subordinated to the Government of France, are in violation of Convention against Torture and internal law of the United States of America.

It appears that claims under the Alien Tort Statute against a foreign state government are precluded by the sovereign immunity.

According [G], [H], from the statement, and [c], involving Public employees of Lebanon in the sequence of the criminal facts against the plaintiff before the year 1996, in the accomplishment of Mercenary actions.

According to the Justice Against Sponsor of Terrorism Act, that narrow, restraint, the application fields of the sovereign immunity.

It appears that the plaintiff is in his right to pretend to request the United States of America District Court of the District of Columbia, **to file a Civil Lawsuit under the Alien Tort Claims Act, against the Government of France**.

### VERIFICATION

*Dalbis Louis-Alexandre noel albert , being duly sworn, deposes and says:*
*I am the plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.*

Date : 07/29/2024

Louis-Alexandre Noel Albert Dalbis

3

Louis-Alexandre noel albert Dalbis
Born the 10/31/1886 à Hyères, VAR, France.
Nationality: French
Telephone: 646-612-6630
Email : dalbis.alexandre@hotmail.com

United States district Court of District of Columbia

**Object** : SHORT AND PLAIN STATEMENT OF THE CLAIM

The complaint of the plaintiff   Dalbis Louis-Alexandre noel albert , respectfully shows and alleges as follows :

A)  The plaintiff's family is proprietary to a private hospital company in France, located in Yvelines, île-de-France.

B)  The plaintiff heard that his Uncle who manages the company encountered his aunt from Australia, and that his aunt has relations with Australian public employees in France through the promotion of Australian art.

C)  The plaintiff read in the newspaper that an Australian company dedicated to private hospital management was buying a lot of small private hospital companies in France.

D)  The plaintiff read in the newspaper that an ancient French polytechnic student had founded a company to manage private hospitals in France and that this company was buying a lot of small private hospital companies.

E)  The plaintiff read in the newspapers that the hierarchy, of the Gendarmerie Nationale, The French army, and public security and intelligence in France, is composed of ancient French polytechnic students

F)  The Plaintiff declare that the French polytechnic school of île-de-France is located near the city of Gif-sur-Yvette. And have facilities in Saclay.

G)  The plaintiff read in the newspaper that the terrorism organization Hezbollah, listed by the United States of America department of State, is located in the country of Lebanon with links in Public services of the country.

H)  The Plaintiff read in newspapers that officials from France and officials from Lebanon were implicated together in the same illegal practices.

I)  The plaintiff heard that another uncle owned a company dedicated to naval construction and had contracts for production of boats with official governmental institutions.

J)  The plaintiff informs the court that around the city of Gif-sur-Yvette there are a lot of French government's facilities, army, nuclear research, energy research and others.

K)  The plaintiff read in newspapers there exists a form of lobbying and a form of Mercenary inside the public institutions, in various manners, including security services

L)  The following statement related facts happened in the life of the plaintiff from before 1996 to 2024.

1) Before 1996, in the city of Garches, Haut-de-Seine, ile-de-France, France, when my brother, half-brother and the plaintiff were following our scholarship at the primary school of Gaston-Ramon.

2) After the classroom, when the plaintiff and his half-brother were walking in the street from the school to the Rue-des-Suisses, because the domicile of their parents was in the corner between the street of the school and street Rue-des-Suisses.

3) An adult white individual approached them, and proposed to them a transparent plastic packet containing a white powder.

4) The plaintiff and his half-brother refused the proposal and went to the domicile of their parents.

5) It is necessary to understand that between the school and the domicile, there is only approximately 300 meters. And a Gendarmerie facility was located in front of the domicile.

6) This fact took place at the entrance of the building property located at only 50 meters from the National Gendarmerie facility.

7) Before 1996, In the city of Garches, Haut-de-Seine, ile-de-France, when the plaintiff followed a scholarship in the Primary School of Gaston-Ramon.During the third years of schooling, in the classroom of CE2, a new student was enlisted in the same.classroom of the plaintiff for one year.

8) The parents of this new student established themselves in an apartment in the same street as the domicile of the plaintiff 's family, in a building just across the street.

9) This new student invited the plaintiff to the domicile of his parents during the year of schooling.

10) This new student mentioned that his family was from the country of Lebanon, and that his parents were affiliated to the Lebanon Embassy and that her mother worked as a housekeeper.

11) But unfortunately, the plaintiff is unable to be certain of  this information,  the plaintiff remembers only partially the use of the term Embassy by the schoolchild.

12) Between the year 1996 and the beginning of the scholarship at the College College-des-Goussons, in the city of Gif-sur-Yvette, Essonne, France, in the district of Chevry-2, on the pedestrian way exclusively dedicated to pedestrian between the primary school des Neuveries and the College des Goussons.

13) From the beginning of the pedestrian way from the sport facility of Neuveries School, just after the first crossover of this pedestrian, in the turn of 90 degrees to the left, a scooter driven by a person from African ethnicity overtook the plaintiff and his half-brother and continued on his course.

14) Whereas the scooter was far away and not visible from the location of the facts

15) Several dozen meters after the turn at 90 degrees, a vehicle from the National Gendarmerie in pursuit of the scooter, seeming not taking in consideration the presence of the plaintiff and his half-brother, missed colliding with them whereas they were walking on the pedestrian way showing their back to the driver of the car.

16) Whereas the driver of the vehicle of the National Gendarmerie saw them from several dozen meters away.

17) In such a way that the plaintiff 's half-brother, who had the time to see that a vehicle was about to collide with them, was in the obligation to project the plaintiff on the  steel mesh towards the pedestrian way, to prevent the collision.

18) Otherwise, the vehicle would have collided with the plaintiff at an excessive speed.

19) After failing to collide with the plaintiff and his half-brother, the speed of the vehicle of the National Gendarmerie was too excessive to allow the driver to correctly negotiate the next turn of the pedestrian way, while the turn is made with a progressive angle.

20) The vehicle of the National Gendarmerie finished its trajectory in the hedge bordering the pedestrian way, leaving tire marks on the asphalt of the pedestrian way.

21) During the period when the plaintiff was enrolled in College des Goussons, in the town of Gif-sur-Yvette, Essonne, France,in the district of Chevry-2, following the facts occurred in the pedestrian way and involving employees of the National Gendarmerie.

22) In the classroom the plaintiff, a child of an employee of the National Gendarmerie was a classmate. This student decided, one day, to invite the plaintiff to the Gendarmerie facility, located near the College des Goussons.

23) The plaintiff and the child of an employee of the Nationale Gendarmerie went to the Gendarmerie facility and the plaintiff briefly visited the function apartment before leaving the facility.

24) The name of the student was "Derek" or "Devrek", maybe the name is misspelled, the child of an employee of the National Gendarmerie was from the African ethnicity.

25) An individual named Gael Cottet, was following his scholarship in the same college as Louis-Alexandre noel albert Dalbis, from the first year of the scholarship at the Goussons College, located in the city of Gif-sur-Yvette.

26) After the school years at the Goussons College, Gael Cottet went to the highschool Lycee-de-L'essouriaut, located in the city of Les-Ulis, Essonne, France, near the city of Gif-sur-Yvette.

27) And that, Louis-Alexandre noel albert Dalbis went to the high school Lycée-de-la-Vallée-de-Chevreuse, located 8 rue de Madrid in the city of Gif-sur-Yvette, Essonne, France.

28) Suddenly, in 2003, Gael Cottet demonstrated an interest in the diving sport, and expressed his concern for the attainment of diving certification.

29) Gael Cottet proposed to participate in an organized travel with the association UCPA to practice diving in Egypt. Louis-Alexandre noel Albert Dalbis accepted the proposal.

30) During a telephone interview, before the date of the departure, Gael Cottet and Louis-Alexandre noel Albert Dalbis had a telephone interview.

31) Gael Cottet indicated that he wanted to bring illegal substances, cannabis type, with him to incorporate it in a hookah, in Egyptian territory. And that, Gael Cottet stipulated that he will make the transportation of the illegal substance from France to Egypt.

32) Louis-Alexandre noel albert Dalbis tried to incite Gael Cottet to didn't accomplish the transportation of the illegal substance, by a dissuasive manner, by indicating that Gael Cottet will not be able to cross the airport border authority controls with illegal substances.

33) Gael Cottet insisted to accomplish this transportation by telling that he will be able to cross, pass, the airport border authority control without any problem.

34) After declining the proposal of the transportation of illegal substances several times. To shorten the telephonic interview, Louis-Alexandre noel Albert Dalbis answered by an affirmative manner, but without the intention to perform the transportation of the illegal substances from Egypt to France, as Gael Cottet wanted.

35) The day of the departure, at the airport, the two individuals, who were 16 years old, were taken in charge by the instructor of the association UCPA, and took the direction of the airport authority control.

36) Gael Cottet didn't mention to the Border Office of France that he was in possession of illegal substances, and Gael Cottet crossed the verification without any problem.

37) At the airport of Hurghada, Gael Cottet crossed the airport border authority control without any problem, always in possession of illegal substances, and didn't mention it to the Egyptian border officer.

38) The buying of the hookah in a shop of the city of Hurghada and the tobacco was performed at the initiative of Gael Cottet, the incorporation of the illegal substance, mixed to the tobacco was accomplished by Gael Cottet.

39) Gael Cottet and Louis-Alexandre noel albert Dalbis, with other youths, accomplished the consumption of illegal substances incorporated in a hookah, in front of the hotel room located in the city of Hurghada, in the Egyptian territory.

40) During the organized travel, in a shop located in the same street of the hotel. And Gael Cottet performed the thief of an object, and insisted to, incited Louis-Alexandre Noel Albert Dalbis to accomplish a robbery. Louis-Alexandre Noel Albert Dalbis didn't perform the robbery.

41)  At the end of the organized travel, in the hotel room, when the two individuals were alone, Gael Cottet signified to Louis-Alexandre Noel Albert Dalbis that he had to accomplish the transportation of the remaining illegal substance dissimulated in his underwear attached with a safety pin. Louis-Alexandre noel albert refused.

42)  Gael Cottet insisted many times but Louis-Alexandre noel Albert Dalbis continued to refuse. Therefore, seeing that Louis-Alexandre noel albert Dalbis will not accomplish the transportation, Gael Cottet became nervous and grasped the arm of Louis-Alexandre noel albert Dalbis to perform a submission hold, and threaten him, in the same time reiterate his demand.

43)  Under the constraint, Louis-Alexandre noel Albert Dalbis accepted to perform the transportation of the illegal substance from Egypt to France.

44)  At the airport border authority control of Hurghada, Egypt, Gael Cottet and Louis-Alexandre Noel Albert Dalbis didn't mention the possession of illegal substances to the Egyptian authority.

45)  Louis-Alexandre noel albert Dalbis crossed the detection portal at the  airport border authority control without any problems and accomplished the transportation of the illegal substance from Egypt to France.

46)  The plaintiff was not aware of the Egyptian legislation concerning the possession and the consumption of this type of illegal substances at the moment when the facts occurred. Not aware of the Egyptian legislation concerning the thief or robbery at the moment when the facts occurred. The legislation is based on the Sharia. And that, those types of actions are severely punished by the local authorities.

---

47)  During the years of scholarship at the high school of Lycée-de-la-Vallée-de-Chevreuse, located in the town of Gif-sur-Yvette, in the street rue-de-Madrid, Essonne, France. Following the organized travel in Egypt.

48)  A female student, named Raphaelle Labat, daughter of a highschool professor, in the same classroom as the plaintiff, was in a relationship with a male student from the same highschool. Their relationship ended.

49)  Few times after, the female student began a relationship with the plaintiff and they had one sexual relation. Raphaelle Labat only masturbated the plaintiff.

50)  It is possible to understand from "Labat masturbate", "masturbate well Labat" or Masturbate the baseball Bat, polish the baseball Bat.

---

51)  In 2005, During the last year of scholarships at the high school of Lycée-de-la-Vallée-de-Chevreuse. Before the highschool spectacle, the plaintiff contracted a dangerous illness, rare and alarming for his health called Rheumatoid Purpura.

52)  The plaintiff was hospitalized for a week, the doctors explained that this illness had for origin a food intoxication.

53)  The plaintiff was suffering renal injury. The plaintiff was weak, vertigo, headaches, severe pain needing the intervention of a nurse and sedative.

54)  After the period of hospitalization, the plaintiff was in the obligation to enter in a long period of convalescence at his parents domicile, for months.

55)  After the period of convalescence, the plaintiff was weak, slim.

56)  The plaintiff resumed the scholarship after being absent for approximately one semester.

---

57) In 2005, during the years of scholarship in this highschool of Lycée-de-la-Vallée-de-Chevreuse, in the city of Gif-sur-Yvette, Essonne, France.

58) The professor in history and geography, named Mr Hocque, maybe it is misspelled, introduced himself as a retired member of the military Navy.

59) During class, because of the plaintiff 's hair, the professor called the plaintiff "Daniel Balavoine" or "Balavoine", a reference to a French singer.

60) During the highschool spectacle at the end of the year 2005, a choral with the theme of "starmania" was performed. This show is known in France because of the singer Daniel Balavoine.

61) The plaintiff's little brother, Arthur Dalbis, was solicited to participate in this show as a choir. The plaintiff saw the show.

62) Is it possible that there exists a relation between the choral performed during the end of the year show of the highschool, Starmania, and the nickname, Balavoine, given by the professor of history and geography.

63) The plaintiff even obtained a diploma of the baccalaureate, that ended the schooling at the highschool, in 2005.

64) A highschool student named Gauthier Tardy introduced to the plaintiff two female persons named Mauve-Cecile Laurant and Alice "Regnet" or "Reignet" (Alice R.).

65) During the summer holidays of the year 2005, the plaintiff went to the city of Bayonne to participate at the Feira of Bayonne, south of France, with Gael Cottet, with Gauthier Tardy, with Mauve-Cécile Laurant, with Alice R., and with other members of the same social network from the city of Gif-sur-Yvette.

66) At the end of the Feira of Bayonne, the plaintiff and Gael Cottet, with other members of the social network of Gif-sur-Yvette, leaved Gauthier Tardy, Mauve-Cécile Laurant and Alice R., to went to the city of Lloret-Del-Mare, Spain.

67) During the stay at Lloret-Del-Mare, the plaintiff and members of the social network encountered another group of individuals coming from the city of Gif-sur-Yvette.

68) After the stay at Lloret-Del-Mare, the plaintiff went back to France.

69) From September 2005, Louis-Alexandre noel albert Dalbis began to study at the Law faculty Jean-Monnet, located in the University of Saclay-Paris-Sud, in the city of Orsay, France.

70) Gauthier Tardy, in relationship with Alice R., acted as a matchmaker by organizing party at his place of domicile with only few people to allow exclusive contact between Mauve-Cecile Laurant and Louis-Alexandre noel albert Dalbis, and by went to appointment with members of the social network with Mauve-Cecile Laurant.

71) Appointments were organized at the place of domicile of Mauve-Cecile Laurant, with a few guests. Louis-Alexandre noel albert Dalbis was invited to sleep at the place of domicile, in the bedroom of Mauve-Cecile Laurant. Louis-Alexandre noel albert Dalbis didn't have an enterprising conduct with Mauve-Cecile Laurant.

72) Mauve-Cecile Laurant expressed to Gauthier Tardy the willingness to have a relationship with Louis-Alexandre noel Albert Dalbis, by an insistent manner, during several weeks.

73) Regarding the insistent conduct adopted by Gauthier Tardy, Mauve-Cecile Laurant and Alice R. during several weeks, Louis-Alexandre noel albert Dalbis consented to begin a relationship with Mauve-Cecile Laurant.

74) Mauve-Cecile Laurant was in a friendly relation with a person named Joris, who lived in the district of Chevry-2 in the city of Gif-sur-Yvette, Essonne, France.

75) Joris and Mauve-Cecile Laurant mentioned that Joris followed a training course in telecommunications, and that he was affiliated with the activity sector of the Army.

76) Gauthier Tardy mentioned that Joris proposed to deliver illegal substances

77)  Mauve-Cecile Laurant claimed that members of her family, including her father Bernard Laurant, were affiliated to security and intelligence services of France,

78) Mauve-Cécile Laurant demonstrated animosity against the plaintiff's female friend by performing caricatured imitation of them in front of the plaintiff. During discussions.

79) After several weeks of relationship with Mauve-Cécile Laurant, a highschool contact named Camille Lamourette indicated to Louis-Alexandre noel albert Dalbis that Claire Chevalier wanted to begin a relationship with him.

80) From the moment when Claire Chevalier adopted a conduct without ambiguity revealing her intentions. Louis-Alexandre noel albert Dalbis ended the relationship with Mauve-Cecile Laurant.

81) Because of the rupture of the relationship, Mauve-Cecile Laurant adopted a disarray conduct in front of Gauthier Tardy, during weeks.

82) Mauve-Cécile Laurant and Alice R., complained constantly, during hours, during weeks, in front of Gauthier Tardy about the end of the relationship, and began to maintain Gauthier Tardy focused on the relationship story of Louis-Alexandre noel Albert Dalbis by deliberately orienting continuously the discussion.

83) In such a way that this discussion topic became for Gauthier Tardy, an important center of interest. Gauthier Tardy began to talk about this topic frequently with other members of the social network in a recurrent manner.

84) At the same time, when Louis-Alexandre noel albert Dalbis had appointments with only Mauve-Cecile Laurant. She didn't demonstrate any state of disarray or sadness.

85) At the end of an organized reception, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant had a sexual relation.

86) The Days following the organized party, Louis-Alexandre noel albert Dalbis began a relationship with Claire Chevalier.

87) Mauve-Cecile Laurant and Alice R., knew by discussing with Gauthier Tardy, that Louis-Alexandre noel albert Dalbis was now in a relationship with Claire Chevalier.

88) Mauve-Cecile Laurant and Alice R., began the moral harassment on the person of Gauthier Tardy, by intentionally focussing the attention of Gauthier Tardy on the person of Louis-Alexandre noel Albert Dalbis by a continuous manner.

89) To establish with more efficiency their psychological influence on the person of Gauthier Tardy, with the help of her friend Alice R., Mauve-Cecile Laurant performed scenography where she was playing out a tragedy, by simulating psychological distress, crying, and complaining.

90) And that, during hours, during weeks. In such a way that the main center of interest, the main topic of discussion, of Gauthier Tardy with members of the social network became, systematically, Louis-Alexandre noel Albert Dalbis.

91) In such a way that members of the social network didn't understand the conduct of Gauthier Tardy.

92) Louis-Alexandre noel albert Dalbis had sometimes appointments with only Mauve-Cecile Laurant. And that, during those appointments, Mauve-Cecile Laurant didn't demonstrate any state of disarray or sadness.

93) Mauve-Cécile Laurant and Alice R., performed moral harassment on the social network, by coming to appointments and creating social discord. in such a way that Louis-Alexandre noel Albert Dalbis preferred to leave appointments.

94) During the same period, Louis-Alexandre noel albert Dalbis and Claire Chevalier had a sexual relation without contraceptive methods. And Louis-Alexandre Noel Albert Dalbis asked if Claire Chevalier will took a contraceptive pill following the sexual relation

95) The plaintiff doesn't know if Claire Chevalier took a contraceptive pill.

96) Louis-Alexandre noel albert Dalbis and Claire Chevalier slept together at the place of domicile of Louis-Alexandre noel albert Dalbis. On the bed, in front of Claire Chevalier, the plaintiff pronounced the name of Mauve-Cecile Laurant while he was in a state of somnolence.

97) During an organized reception without Claire Chevalier, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant joined each others and leave the reception together.

98) Louis-Alexandre noel albert Dalbis made the proposal to Mauve-Cecile Laurant to go sleep with him at his place of domicile. During the way to his place of domicile, the plaintiff sent a SMS to Claire Chevalier with the objective to end their relationship.

99) After arriving in the bedroom of Louis-Alexandre Noel Albert Dalbis, they performed a sexual act.

100) Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant were in a relationship again.

101) During the schooling year 2005-2006, Mauve-Cecile Laurant was registered in an audiovisual technical school, and had to perform a movie to present at an exam.

102) The scenario of the movie was about the opposition by a militant group against the construction of infrastructure where there is a beautiful tree. The movie synopsis was about the rescue of the tree.

103) In a movie scene, Louis-Alexandre noel albert Dalbis had to avoid, on a road, a car who was accelerating on him by jumping at the last moment, on the side of the road.

104) During the period between September 2005 to November 2005, Louis-Alexandre noel albert Dalbis reclaimed a distress rocket during an appointment with highschool student named Thomas Garro and Thibault Couanon, in the city of Saint-Rémy-lès-Chevreuse , Yvelines, France.

105) Few time after, during an appointment with Mauve-Cecile Laurant and Vincent Bremond, at the garden space between the Allée-de-la-pièce-du-Lavoir and allée-du-Champs-de-la-mare, in the city of Gif-sur-Yvette , Essonne, France, Louis-Alexandre noel albert Dalbis used the distress rocket in the direction of the sky and injured himself.

106) Following the use of the distress rocket, which illuminates the sky at a high altitude, Louis-Alexandre noel Albert Dalbis didn't receive any summon from authority.

107) After the first semester of the university year 2005-2006, because of the relationship, Louis-Alexandre noel Albert Dalbis began to cease the study course at the university and Mauve-Cecile Laurant ceased to follow the course training at the audiovisual technical school, whereas the price of the training was very expensive.

108) At the place of domicile of Mauve-Cecile Laurant, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant, frequently stayed to perform sexual acts during days, weeks. During sexual Mauve-Cecile Laurant emitted bursts of voice in relation with the acts, during the night. While the bedroom of her parents was at the other side of the corridor, approximately 20 meters, on the same floor.

109) Mauve-Cecile Laurant indicated to Louis-Alexandre noel albert Dalbis that their parents didn't know that he was in the house during the time he was staying at the place of domicile of Mauve-Cecile Laurant.

110) Mauve-Cecile Laurant was fond of cannabinoid illegal substances, and she procured illegal substances by a gratuitous manner by using Louis-Alexandre noel Albert Dalbis at her advantage, and prevented transportation and payments for the illegal substance. When Louis-Alexandre noel Albert Dalbis didn't want to buy the illegal substance, Mauve-Cecile Laurant became insistent and unhappy, irritable.

111) And that, the two individuals often went to the city of Paris, France, to accomplish various activities, cinema, museum, restaurant, at the expense of Louis-Alexandre noel albert Dalbis.

112) Mauve-Cecile Laurant became the privileged interlocutor of Louis-Alexandre noel albert Dalbis, and began to isolate him. Louis-Alexandre noel albert Dalbis frequented less and less the members of the social network of Gif-sur-Yvette and frequented more and more, only Mauve-Cecile Laurant.

113) In the same time, Mauve-Cecile Laurant and Alice R. continued to deliberately orientate discussions on the subject of the relationship story of the Plaintiff, continuously, in presence of Gauthier Tardy.

114) During the year 2006, Vincent Bremond organized his anniversary in a rented place, the Le-relais-de-la-benerie, located next the D988, near the city of Gometz-la-ville. Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant were invited.

115) Firstable, Mauve-Cecile Laurant tried to prevent the Plaintiff from going to this party by simulating psychological distress.

116) During the event, Mauve-Cecile Laurant and Louis-Alexandre Noel Albert went to the parking, and Mauve-Cecile Laurant tried to perform a blowjob to Louis-Alexandre noel albert Dalbis. Because of the location, the context, Louis-Alexandre noel albert Dalbis was unable to have an erection

117) During the party, Mauve-Cecile Laurant and Louis-Alexandre noel albert went back to the parking. Mauve-Cecile Laurant performed an affective blackmail by trying to make him jealous. Louis-Alexandre noel albert Dalbis stayed hermetic to the solicitation of Mauve-Cecile Laurant.

118) Then, Mauve-Cecile Laurant simulated a state of sadness by crying, sitting on a rock bordering the parking. Louis-Alexandre noel albert Dalbis stayed hermetic and because he noticed that she was simulating, he decided to deliver a hit with his foot at the bottom of the buttock of Mauve-Cecile Laurant, with a moderate strength.

119) Because Louis-Alexandre noel albert Dalbis aimed for the pocket of the jean of Mauve-Cecile Laurant, he missed the back of the buttock and hit above. Louis-Alexandre Noel Albert Dalbis performed this hit with the interior of his foot without the intention to generate a high pain.

120)     Mauve-Cecile Laurant left the party with Gauthier Tardy and Alice R., by car. Louis-Alexandre noel albert Dalbis left the reception. And went to the garden of the place of domicile of Mauve-Cecile Laurant, and uttered insults from the garden, and then took the bicycle of Mauve-Cecile Laurant to go to his place of domicile.

121)     Next days, the Plaintiff didn't remember how he returned to his place of domicile from the location of the event. That generated a situation of incomprehension with other members of the social circle. After recovering from the party, the plaintiff remembered the facts.

122)     Following events happened in the parking area at the Relais-de-la-bennerie, involving a hit with the foot performed by Louis-Alexandre noel albert Dalbis. Mauve-Cecile Laurant and Alice R., performed moral harassment on the person of Gauthier Tardy.

123)     By simulating psychological distress, crying, and complaining constantly, more intensively than previous moral harassment , during hours, during week.

124)     By maintaining Gauthier Tardy focused on the relationship story of Louis-Alexandre noel Albert Dalbis by deliberately orienting discussions.

125)     In such a way that, after weeks, the main center of interest, the main topic of discussion, of Gauthier Tardy with members of the social network, systematically, continued to be about Louis-Alexandre noel Albert Dalbis, during several appointments over a period of several weeks, with or without the presence of Louis-Alexandre noel albert Dalbis.

126)     In such a way that, many times, members of the social network called Louis-Alexandre noel albert Dalbis and evoked the conduct of Gauthier Tardy, because they were upset.

127)     Because of the moral harassment, the state of Gauthier Tardy decreased. The relation with those two female individuals provoked an alteration of his mental illness. And generate a state of psychological fixation.

128)    Because the topic of Louis-Alexandre noel albert Dalbis became his only center of interest. Gauthier Tardy wasn't in the capacity to project himself in the future,  with professional objectives. Gauthier Tardy was not in capacity to have a debate concerning newspapers or media information. Gauthier Tardy didn't practice Volleyball anymore.

129)    Despite the situation, Louis-Alexandre Noel Albert Dalbis and Mauve-Cécile Laurant were in a relationship again. But  the plaintiff was not welcomed at the domicile of  Mauve-Cecile Laurant.

---

130)    During the period between September 2005 and July 2006, the conduct of Mauve-Cecile Laurant was ambivalent, she was appearing as a sensitive person, fragile, emotive, in distress during her social relation with members of the social network of Gif-sur-Yvette.

131)    But, during her exclusive social relations with Louis-Alexandre noel albert Dalbis, she was appearing as another person, avid of sexual relations, without fragility, without any problem concerning Louis-Alexandre noel albert Dalbis.

132)    At the beginning of the summer holidays 2006, Mauve-Cecile Laurant and Louis-Alexandre noel albert Dalbis ended the relationship.

---

133)    In September 2006, Louis-Alexandre noel Albert Dalbis began a study course at the  law university, Paris-Sud-Saclay.

134)     During the first semester at the law faculty, Louis-Alexandre noel albert Dalbis was in a relationship again with Mauve-Cecile Laurant.

135)     Because of the relationship, Louis-Alexandre noel Albert Dalbis began to cease the study course at the university and Mauve-Cecile Laurant ceased to follow the course training at the audiovisual technical school, whereas the price of the training was very expensive.

136)    Following the fixation problem generated by the harassment conduct performed the previous year. The social network from Gif-sur-Yvette didn't want to be aware anymore about the relationship story of Louis-Alexandre noel albert Dalbis. Mauve-Cecile Laurant and Louis-Alexandre noel Albert Dalbis, in relationship, didn't continue to have relations with the social network of Gif-sur-Yvette.

137)    During the university year 2006-2007, Mauve-Cecile Laurant became the privileged interlocutor of Louis-Alexandre noel albert Dalbis.

138)    Mauve-Cecile Laurant insisted to encounter and spend time with Louis-Alexandre noel albert Dalbis at her place of domicile. And that, she asked him frequently to use the garden of the house and went to a window to come in the house.

139)    Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant, performed sexual acts during days, weeks. Louis-Alexandre noel albert Dalbis frequently stayed at the place of domicile of Mauve-Cecile Laurant during weeks. Sexual acts was noisy.

140)    The two individuals often went to the city of Paris, France, to accomplish various activities, cinema, museum, restaurant, at the expense of the plaintiff.

141)    When Louis-Alexandre noel Albert Dalbis didn't want to buy the illegal substance, Mauve-Cecile Laurant became insistent and unhappy, irritable.

142)    Mauve-Cecile Laurant indicated to Louis-Alexandre noel albert Dalbis that their parents didn't know that he was in the house during the time he was staying at the place of domicile of Mauve-Cecile Laurant.

143)    During the year 2007, various social relations with local social networks of Gif-sur-Yvette became practically  non-existent, or definitely ruptured.

144)    Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant ended the relationship before the summer holidays of the year 2007.

145)    In September 2007, Louis-Alexandre Noel Albert Dalbis was registered at the university of Paris-Sud-Saclay, to follow a study course in biology.

146)    During the first semester, Mauve-Cecile Laurant and Louis-Alexandre noel Albert Dalbis were In a relationship.  Louis-Alexandre noel albert Dalbis ceased to study at the university. Mauve-Cecile Laurant was registered in an audiovisual technical school located in Paris, and was ,always, often absent.

147)    Louis-Alexandre noel albert Dalbis proposed to Mauve-Cecile Laurant to come at the apartment located in the city of Paris , France, to diminish the time of travel to go to  the audiovisual technical school. Mauve-Cecile Laurant accepted.

148)    The two individuals alternate their stay at the apartment located in Paris and the place of domicile of Mauve-Cecile Laurant, to perform sexual acts during days, weeks. Sexual acts were noisy because of Mauve-Cecile Laurant.

149)    The two individuals went to the city of Paris, France, to accomplish various activities, cinema, museum, restaurant. At the expense of the plaintiff.

150)    During the year 2008, various social relations with local social networks of Gif-sur-Yvette and Saint-Rémy-lès-Chevreuse, became practically nonexistent, or definitely ruptured.

151)    Louis-Alexandre noel albert Dalbis had social relations with his cousins and members of their social network,  who sometimes occupied the apartment located in Paris, France.

152)    During the end of the schooling year 2007-2008, during one of their stay at the apartment in Paris, Mauve-Cecile Laurant was following an internship at the Opera-Bastille, located in Paris, France.

153)    Louis-Alexandre noel albert Dalbis said that he didn't know how to manage his financial situation. Bearing in mind that, Louis-Alexandre Noel Albert Dalbis wasn't in a bad financial situation.

154)    The discussion was not concerning a dramatic situation, susceptible to the emergence of panic, psychological suffering, or putting them in a state where they will want to make an attempt on their life.

155)    Louis-Alexandre noel albert Dalbis didn't designate Mauve-Cecile Laurant for being responsible for the situation. And that, Louis-Alexandre noel albert Dalbis didn't perform intimidation or threat in relation with the financial situation.

156)    Mauve-Cecile Laurant didn't express any sentimental conduct, and stayed indifferent.

157)    Louis-Alexandre noel albert Dalbis went into the kitchen to take a knife and went back to the living room of the apartment.

158)    Louis-Alexandre noel albert Dalbis performed the gesture of the "Hara-Kiri" as a cultural reference. Louis-Alexandre noel Albert Dalbis didn't intimidate or threaten Mauve-Cecile Laurant with an ambiguous gesture.

159)    Mauve-Cecile Laurant abstained voluntarily herself to fight a sinister situation by not accomplishing gestures to give assistance to Louis-Alexandre noel albert Dalbis. And that, because she knew that Louis-Alexandre noel albert Dalbis will not perform a suicide attempt.

160)    Louis-Alexandre noel albert Dalbis deposited the knife on the table next to the kitchen. Louis-Alexandre noel Albert Dalbis moved forward to sit down next to Mauve-Cecile Laurant. Mauve-Cecile Laurant didn't express any sentimental conduct, any compassion conduct.

161)    Louis-Alexandre noel albert Dalbis decided to go next to the television and the DVDrom with the intention of watching a movie.

162)    And that, behind him, Mauve-Cecile Laurant got up and went to the kitchen. Louis-Alexandre noel albert Dalbis saw her raising, performing a smile of satisfaction, while she was passing the door of the kitchen. Mauve-Cécile Laurant didn't saw him.

163)    Louis-Alexandre noel albert Dalbis put the DVD, and waited several dozen seconds until Mauve-Cecile Laurant came back from the kitchen.

164)    Because he didn't hear any common noise from the kitchen, Louis-Alexandre noel albert Dalbis got up and went to the kitchen.

165)    Mauve-Cecile Laurant was sitting on the floor, with a knife in her hand. Louis-Alexandre noel Albert Dalbis rapidly took the knife from the hand of Mauve-Cecile Laurant.

166)    Mauve-Cécile Laurant scratched superficially her other arm with 2 or 3 cuts. The scratches were similar to injuries following the crossing of brambles.

167)     At the initiative of Louis-Alexandre noel albert Dalbis, the two individuals went into the bathroom. Louis-Alexandre noel albert Dalbis performed gestures corresponding to a person who gave assistance to Mauve-Cécile Laurant, cleaning the cuts, rinsing the scratches by letting cold water flow from an area upper to the scratches, using soap to clean the area of the scratches, rolling the arm with toilet paper.

168)     Back to the living room to sit, Louis-Alexandre noel albert Dalbis questioned Mauve-Cecile Laurant about the accomplishment of a false suicidal attempt during several dozen of minutes.

169)     Louis-Alexandre noel albert Dalbis mentioned that she performed a simulated suicidal attempt and that he didn't believe her conduct.

170)     Mauve-Cécile Laurant said that she didn't know why she performed this action.

171)     Mauve-Cecile Laurant didn't correspond to a person suffering agony, sad, or corresponding to a person traumatized by a attempt to her life, trembling, cold sensation, balance disorder, elocution disorder.

172)     Mauve-Cecile Laurant never mentioned or demonstrated any psychological disorder that let appears that she will be able to perform a suicidal attempt.

173)     Mauve-Cecile Laurant wasn't in a situation or combination of elements, with an impact on her psychological illness or causing a serious prejudice leading to suicidal conduct.

174)     Mauve-Cecile Laurant wasn't under a state of psychological submission, the result of pressure or other techniques to alternate her judgment and discernment.

175)     Before the discussion, the two individuals consumed illicit products but it was only the leaf of the Cannabis plant that contained a weak rate of THC.

176)     Following the discussion, Louis-Alexandre noel Albert Dalbis and Mauve-Cecile Laurant prepared the bed for sleeping together.

177)     Louis-Alexandre noel albert Dalbis performed a gesture of caress.

178)     Mauve-Cécile Laurant manifested verbally by a negative manner, her default of consent to the accomplishment of a sexual act.

179)     At the same time, Louis-Alexandre noel albert Dalbis looked to the visage of Mauve-Cecile Laurant without being seen by her. She was smiling in a satisfying manner.

180)     Louis-Alexandre noel albert Dalbis reiterates his previous demand verbally

181)     Mauve-Cecile Laurant didn't answer. Louis-Alexandre noel albert Dalbis masturbated himself because he was not excited by the situation.

182)     Louis-Alexandre noel albert Dalbis performed gestures of caress without any ambiguity of interpretation concerning the future sexual act.

183)     Louis-Alexandre noel albert Dalbis, performed touching to the sex of  Mauve-Cécile Laurant.

184)     Louis-Alexandre noel albert Dalbis, removed her underwear. Mauve-Cecile Laurant was sweating.

185)     Louis-Alexandre approached his sexe to the vagina of Mauve-Cecile Laurant.

186)     Louis-Alexandre noel albert Dalbis performed a slow act of penetration.

187)     Louis-Alexandre noel albert Dalbis, didn't accomplish maneuvers to obtain a surprise effect. Didn't perform a violent act of penetration, with the use of physical constraint, by maintaining to prevent gestures or involuntary muscular reactions to avoid the act of penetration. Didn't use psychological constraint, by threatening or blackmailing to obtain consent. Didn't profit from a psychological weakness, state of shock, or effect of the drugs previously consumed to obtain consent.

188)     Because Mauve-Cecile Laurant let Louis-Alexandre noel albert Dalbis accomplished this sexual act, he performed an acceleration of the sexual gestures, botching of the sexual act, during his sexe was into the vagina.

189)     Louis-Alexandre noel albert Dalbis ejaculated promptly in her vagina.

190)     Mauve-Cecile Laurant verbally manifested her deception in relation to the botching of the act

191)     Mauve-Cecile Laurant got up and went to the bathroom. Louis-Alexandre noel albert Dalbis heard a noise of something similar to vomiting. Mauve-Cecile Laurant went back to the bed.

192)     Mauve-Cecile Laurant didn't have an attitude that demonstrated disgusting feeling or sentiment concerning Louis-Alexandre noel albert Dalbis. The plaintiff believes that Mauve-Cecile Laurant let him perform a sexual act because she wanted him to have some sort of trouble.

193)     Mauve-Cecile Laurant accomplished the internship at the Opera-Bastille and invited Louis-Alexandre noel albert Dalbis to visit the Opera. Mauve-Cecile Laurant was wearing a bandage at the level of the left arm.

194)     Before the summer holidays, the relationship between the two individuals ended.

195)     Between September 2005 to December 2006.

196)     Louis-Alexandre Noel Albert Dalbis and Mauve-Cécile Laurant were coming back from the city of Les-Ulis, Ile-de-France ,France, after buying a small quantity of illegal substances, cannabis type.

197)     The two individuals decided to consume illegal substances in the temporary holding vessel of used water, located near the entrance of street rue-Serge-Prokofiev, Les-Ulis, Essonne, France.

198)     Louis-Alexandre noel albert Dalbis began to accomplish a monologue concerning a topic of discussion. Mauve-Cécile Laurant, demonstrates her capacity to perform a debate, by asking Louis-Alexandre noel albert Dalbis to perform a blowjob on him.

199)     And that, Louis-Alexandre noel albert Dalbis answered to the proposal by the negation.

200)     Between the year 2005 to 2007

201)     Louis-Alexandre noel albert Dalbis and Mauve-Cécile Laurant decided to sleep in a tent , together, in the garden space between the Allée-de-la-pièce-du-Lavoir and the Allee du champ de la Mare, located in the district of Chevry-2, Gif-sur-Yvette, France.

202)     The two individuals had a sexual relation.  The next day, the individuals went back to their own place of domicile.

203)     Between the year 2005 and 2009

204)     Louis-Alexandre Noel Albert Dalbis and Mauve-Cécile Laurant stayed at her place of domicile to accomplish sexual acts, several times during a day, many days. The two individuals accomplished sexual acts during the night.

205)     In the morning, while Louis-Alexandre Noel Albert Dalbis was still asleep, Mauve-Cécile Laurant began to perform a blowjob on him without the implicit or explicit consent of the plaintiff.

206)     Still under a state of somnolence, Louis-Alexandre noel Albert Dalbis felt something and opened his eyes, and expressed explicitly a negation directly.

207)     At the same time, while the plaintiff expressed his default of consent, Mauve-Cecile Laurant undertook the action to load the sexe in her vagina. Without letting the possibility to Louis-Alexandre noel albert Dalbis to avoid the sexual act.

208)     Between the year 2005 to 2009

209)     Louis-Alexandre Noel Albert Dalbis and Mauve-Cécile Laurant stayed at her place of domicile to accomplish sexual acts, several times during a day, many days.

210)     Mauve-Cecile Laurant, during her cycles of menstruation, didn't indicated any contrariety for accomplishing sexual acts of penetration or cunnilingus. Mauve-Cecile Laurant was excited.

211) It is common for a woman to refuse or demonstrate reticence for accomplishing sexual acts during cycles of menstruation

212)   Between the year 2005 to 2009
213)   Sometimes, the plaintiff and Mauve-Cécile Laurant went to the city of Paris to have some amusement. And took the night bus to go to Gif-sur-Yvette from Paris. The Noctilien.
214)   In the bus, Louis-Alexandre noel albert Dalbis proposed to Mauve-Cecile Laurant to accomplish a blowjob on him because the two individuals were practically alone in the bus
215)   Despite the excessive perspiration and the unpleasant odor released by his sexe. Mauve-Cécile Laurant performed a blowjob. The plaintiff was disgusted.
216)   Also, Mauve-Cécile Laurant performed blowjob on the plaintiff in a movie theater, in the city of Paris.
217)   In addition, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant went to the shop Zara.  In the changing room of the shop, the two individuals performed a sexual act.

218)   Between the year 2005 to 2009
219)   Mauve-Cecile Laurant and Louis-Alexandre Noel Albert Dalbis performed sexual acts inside the car.
220)   Louis-Alexandre noel albert Dalbis ejaculated on the back of the buttock of Mauve-Cecile Laurant, and she put her trousers back and sat next to Louis-Alexandre noel albert Dalbis.

221)   Between the year 2005 to 2009
222)   Louis-Alexandre Noel Albert Dalbis and Mauve-Cécile Laurant stayed at her place of domicile to accomplish sexual acts, several times during a day, many days.
223)   During a discussion about sexual relations, Mauve-Cecile Laurant indicated to Louis-Alexandre noel albert Dalbis that he could accomplish sexual acts , also during the night, at any time.
224)   According to the previous sexual conduct of Mauve-Cecile Laurant, Is it a request for an illegal sexual act ?

225)   Despite those facts Mauve-Cecile Laurant reiterated her desire to be in a relationship with Louis-Alexandre noel albert Dalbis.
226)   In 2006. Louis-Alexandre noel albert Dalbis performed a hit with the foot at the bottom of the buttock. Louis-Alexandre noel albert Dalbis missed the buttock.
227)   In 2005. Louis-Alexandre noel albert Dalbis, a few days after having sexual relation with Mauve-Cécile Laurant, began a relationship with Claire Chevalier
228)   In 2006. The plaintiff went to the garden of the place of domicile of Mauve-Cecile Laurant, and uttered insults from the garden.
229)   In 2006-2009. The plaintiff spit two times on Mauve-Cecile Laurant. At Saint-Rémy-lès-Chevreuse, during the pause of her work. And at Gif-sur-Yvette, after a discussion.
230)   In 2006-2009. Louis-Alexandre noel albert Dalbis tipped Mauve-Cecile Laurant slowly backwards to deposit her gently on the ground. Louis-Alexandre noel albert Dalbis performed a gentle light swap and simulated to give her a hit with foot.

231) Despite those facts the parents of Mauve-Cécile Laurant didn't assert to the plaintiff their interdiction to come back to the domicile, while they were aware of his presence.

232) In 2006-2009. Mauve-Cecile Laurant invited Louis-Alexandre noel albert Dalbis to her place of domicile for nights. After a discussion, Mauve-Cecile Laurant pursued Louis-Alexandre noel albert Dalbis in the living room. Louis-Alexandre noel albert Dalbis took the key on the table and scratched the table with the key, leaving a visible scuff.

233) In 2005-2009. Louis-Alexandre noel albert Dalbis resided during days, weeks at the place of domicile of Mauve-Cecile Laurant. The two individuals performed noisy sexual acts during days, night, during weeks, in the bedroom of Mauve-Cecile Laurant. The bed tapped the wall.

234) By noticing that Louis-Alexandre noel albert Dalbis performed false gestures of aggression in such a manner that the final result is similar to squabbling, puerility.

235) Mauve-Cecile Laurant believed that the plaintiff was aware of the maneuver's objectives.

236) Mauve-Cécile Laurant performed a hidden verification by asking indirectly questions about the possibility that the plaintiff was aware of something. And the plaintiff noticed a change of conduct from Mauve-Cecile Laurant.

237) After noticing that the plaintiff didn't understand the solicitation, the indirect questioning , Mauve-Cecile Laurant was reassured and continued to perform maneuvers.

238) During the summer holidays of 2008, Louis-Alexandre noel albert Dalbis was enrolled as an employee of the association Regards, as an animator for an organized travel that occurred in the city of Lloret-Del-Mare, Spain, at the hotel Samba, located on the street Carrer-de-Fransesc-Cambo.

239) Louis-Alexandre noel albert Dalbis was in charge of the group of individuals from 12 years old to 14 years old.

240) The sub-director of the organized travel was coming from the city of Meaux, Seine-et-Marne, France. And that, the sister of Mauve-Cecile Laurant was living in the city Meaux.

241) The organized travel was appreciated by the group of youth whose Louis-Alexandre noel albert Dalbis was in charge of.

242) During the year 2008, after the summer holidays, Louis-Alexandre noel albert Dalbis was registered at the law faculty of Saint-Quentin-en-Yveline, Yveline, France.

243) The 10/31/2008, the day of the anniversary of the plaintiff. Louis-Alexandre noel albert Dalbis and Tomas Garro were at the train station of Saint-Rémy-lès-Chevreuse, Yvelines, France, during the night.

244) Two individuals from white ethnicity, robustly similar to military employees, were waiting for Louis-Alexandre noel albert Dalbis and Thomas Garro. One of them spit especially and deliberately on the person of Louis-Alexandre noel albert Dalbis. Despite any provocation, any gestures, any reasons.

245) The plaintiff performed a gesture to prevent Thomas Garro from engaging in a fight and removed the spit from his coat.

246)     During the university year 2008-2009. Louis-Alexandre noel albert Dalbis was registered at the law faculty in the city of Saint-Quentin-en-Yveline, Yveline, France.

247)     Louis-Alexandre noel albert Dalbis was introduced and socialized by Thomas Garro and Thibault Couanon with a social network of Saint-Rémy-lès-Chevreuse. he nourished amicable relation with this social network and participated in music session.

248)     Louis-Alexandre noel albert Dalbis encountered a female person from the social network of Saint-Rémy-lès-Chevreuse, and slept in the same bed with this female person.

249)     Louis-Alexandre noel albert Dalbis had the intention to initiate a relationship with this female person.

250)     Louis-Alexandre noel albert Dalbis was living in a rented apartment in the city of Guyancourt, next to the university.

251)     The plaintiff had sexual relation with a female in the apartment.

252)     Louis-Alexandre noel albert Dalbis was also in social contact with students of the law University and invited them sometime with the objective to constitute a group of work.

253)     Louis-Alexandre Noel Albert Dalbis contacted by email Mauve-Cecile Laurant and proposed that she come to live in the apartment.

254)     Mauve-Cecile Laurant came to live in the apartment, and Louis-Alexandre noel albert Dalbis met her female friend  who lived near the city of Guyancourt, Yvelines, France.

255)     At the rented  apartment, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant, performed sexual acts during days, weeks.

256)     The social relations   between Louis-Alexandre noel albert Dalbis with the social network of Saint-Rémy-lès-Chevreuse ended.

257)     Mauve-Cecile Laurant found a job as a vendor, rapidly, directly, in the huge Commercial center of Saint-Quentin-en-Yveline, Yvelines, France, in a clothing shop.

258)     At the university, Louis-Alexandre noel albert Dalbis had already reached the limit of absence for the English course, and was in pain of being considered defaulting for the first semester at the University.

259)     Louis-Alexandre noel albert Dalbis indicated this information to Mauve-Cécile Laurant, the day before the English lesson.

260)     The next day, without any reasons, any basis, Mauve-Cécile Laurant began to simulate psychological distress. Louis-Alexandre Noel Albert Dalbis knew that she was playing a role.

261)     Louis-Alexandre noel albert Dalbis left the apartment to go to the English lesson.

262)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

263)     On the way to the university, the plaintiff went back to the apartment.

264)     Despite knowing, surely, certainly, that Mauve-Cécile Laurant was simulating psychological distress.

265)     Louis-Alexandre noel albert Dalbis missed the English lesson and was considered as defaulting.

266)     Louis-Alexandre noel albert Dalbis ceased to follow the study course at the university.

267)     At the rented  apartment in the city of Guyancourt, Yvelines, France, Louis-Alexandre noel albert Dalbis and Mauve-Cecile Laurant, were performing sexual acts during days, weeks.

268)     Louis-Alexandre noel albert Dalbis found a work at the Mac Donald's restaurant located in the commercial center of Saint-Quentin-en-Yveline.

269)    Mauve-Cecile Laurant planned an appointment by phone, with Louis-Alexandre noel albert Dalbis, in the pedestrian street of the Commercial center of Saint-Quentin-en-Yveline.

270)    Louis-Alexandre noel albert Dalbis left the apartment to go to the appointment, and passed in a pedestrian way called Parvis-des-Sources.

271)    Louis-Alexandre noel albert Dalbis saw an individual from white ethnicity, tall, robustly similar to military employees, pass in front of him and doing something with an individual from African ethnicity who was waiting.

272)    On this pedestrian way, a group of individuals from the African ethnicity engaged in a fight with the plaintiff . The individuals from African ethnicity began to punch him, and took his coat.

273)    Louis-Alexandre noel albert Dalbis joined Mauve-Cecile Laurant in the pedestrian street of the Commercial center.

274)    Louis-Alexandre noel albert Dalbis had only a few injuries, a little hemorrhaging of the lips. Mauve-Cecile Laurant insisted on going to the police station to file a complaint.

275)    Louis-Alexandre noel albert Dalbis had an interview with a female  Public employee of the police station.

276)    During the period when Mauve-Cecile Laurant and the plaintiff lived in the same apartment in the city of Guyancourt, at the street Boulevard-d'Alembert, Yvelines, France.

277)    The plaintiff was under the influence of advanced psychological manipulation techniques.

278)    During a night, Mauve-Cécile Laurant and Louis-Alexandre Noel Albert Dalbis were sleeping, without any reasons, the plaintiff woke up and took a knife

279)    Louis-Alexandre left the apartment to go to the garden park in front of the apartment.

280)    Inside the forest of the park, the plaintiff sat down on a public bench. Then, advanced into a hedge, put himself on his knee and began to try to scratch his arm with the knife.

281)    Louis-Alexandre Noel Albert Dalbis described the feeling during the accomplishment of the gesture by : he accomplished the gesture by scratching his arm but forced his brain to not scratch his arm.

282)    Louis-Alexandre noel albert Dalbis was affixed a sort of counter strength to prevent the accomplishment of this action, with the knife above his arm.

283)    Louis-Alexandre Noel Albert Dalbis went back to the apartment and returned in the bed with Mauve-cécile Laurant.

284)    During the first month of the year 2009, Mauve-Cecile Laurant left the apartment and changed her phone number to become uncontactable. This is the first time that she change her phone number.

285)    This fact finally ends the relationship in a definitive manner. Louis-Alexandre noel albert Dalbis didn't had any contact with Mauve-Cécile Laurant.

286)    Before ending the relationship, Mauve-Cecile Laurant insinuated that something will happen to Louis-Alexandre noel Albert Dalbis.

287)   Following the end of the relationship, Louis-Alexandre noel albert Dalbis resided in the rented apartment in the city of Guyancourt, Yvelines, street Boulevard-d'Alembert.

288)   The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

289)   Louis-Alexandre noel albert Dalbis,  without any reasons, took the first thing at his range to hang it at the ceiling hook and perform  hanging gestures with a cable of connection for digital equipment. Under his weight, the cable broke.

290)   At the proximity of the cable of connection, there was also a piece of rope.

291)   The plaintiff described the act by the following manner: this act was performed thoughtlessly and he didn't choose to take the cable of connection for numerical material to perform the hanging.

292)   During the period between January 2009 and May 2009. Without any reason, Louis-Alexandre noel albert Dalbis went to the FNAC store at the huge Commercial center of Saint-Quentin-en-Yveline.

293)   The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

294)   In the shop, Louis-Alexandre noel albert Dalbis spent several minutes in front of the store shelves where the book named Coran was stored.

295)   Louis-Alexandre noel albert Dalbis left the FNAC store and went back to the rented apartment without purchasing anything.

296)   Louis-Alexandre noel albert Dalbis rescinding the rent of the apartment located in the street Boulevard-d'Alembert, in the city of Guyancourt, Yvelines, France, and returned living in the city of Gif-sur-Yvette, at the domicile of his parents.

297)   During the summer holidays of 2009, Louis-Alexandre noel albert Dalbis was enrolled as an employee of the association Regards, as an animator for the organized travel that occurred in the city of Lloret-Del-Mare, Spain, at the hotel Samba, located on the street Carrer-de-Fransesc-Cambo

298)   Louis-Alexandre noel albert Dalbis was in charge of the group of individuals from 14 years old to 16 years old.

299)   The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

300)   During the organized travel, Louis-Alexandre noel albert Dalbis was subject of a professional fault by abandoning his work, during the evening, without justifications, to go to a tattoo shop for getting a non permanent Tattoo of a head of animal on the arm.

301)   The hotel was under the surveillance of a security team, and the swimming pool under the surveillance of a lifeguard.

302)   Louis-Alexandre noel albert Dalbis gave instructions to the group of youth to stay at the hotel and with the authorization to use the swimming pool.

303)   Louis-Alexandre noel albert Dalbis abandoned his work for only approximately 30 to 45 minutes.

304)   Louis-Alexandre noel albert Dalbis was in the obligation to leave the hostel and to return to France.

305)   Louis-Alexandre noel albert Dalbis took the bus from Lloret-Del-Mare to Barcelona and took a flight in the direction of Paris, France.

306)    During the year 2009, The brother of Louis-Alexandre noel albert Dalbis was occupying the apartment In the city of Paris. Louis-Alexandre noel albert Dalbis visited his brother and stayed sometime during days.

307)    When Louis-Alexandre noel albert Dalbis was staying in the apartment, and his brother was not present.

308)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

309)    Louis-Alexandre noel albert Dalbis moved closer to the window located on the fifth floor and overlooking the courtyard.

310)    Louis-Alexandre noel albert Dalbis was victim of advanced psychological manipulation techniques to make him having a suicidal conduct.

311)    Louis-Alexandre noel albert Dalbis is subject to vertigo by a manner that he avoids to be closer to a window located at a high elevation.

312)    Louis-Alexandre noel albert Dalbis, was leaning on the handrail of the window.

313)    Louis-Alexandre noel albert Dalbis was  under the influence of advanced psychological manipulation techniques to get over the handrail to fall in the courtyard.

314)    Louis-Alexandre noel albert Dalbis described the act by the following manner, it is because he have the vertigo that he was repulsed to getting over the handrail.

315)    During the year 2009, The brother of Louis-Alexandre noel albert Dalbis was occupying the apartment in the city of Paris. Louis-Alexandre noel albert Dalbis visited his brother and stayed sometime during days.

316)    During the night, Louis-Alexandre noel albert Dalbis without any reasons, got up and went into the kitchen to take a knife and left the apartment to go to the garden park near the Saint-Lazare train station, along the La-Seine river banks.

317)    Louis-Alexandre noel albert Dalbis advanced inside the park near the houseboat of the association Les-restos-du-Coeur, and began to try to scratch his arm with the knife.

318)    Louis-Alexandre Noel Albert Dalbis described the feeling during the accomplishment of the gesture by he accomplished gestures for scratching his arm but this time was nervous, without understanding what was happening, and threw the knife against a wood palisade.

319)    Louis-Alexandre Noel Albert Dalbis was also under the influence of advanced psychological manipulation techniques to throw himself into the river of La-Seine.

320)    And then, Louis-Alexandre noel albert Dalbis went back to the apartment

321)    Louis-Alexandre noel albert Dalbis contacted his Grand-Parents to have the possibility to work as an employee of agricultural exploitation during the summer holidays 2009. It was possible to work for one month.

322)    Louis-Alexandre noel albert Dalbis went to Sologne, France, in the agricultural exploitation, and resided in the farm accommodations.

323)    During the period when Louis-Alexandre noel albert Dalbis was working and accomplishing a difficult physical work that led to him being very tired every day.

324)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

325)    At the end of the evening, after work, Louis-Alexandre noel albert Dalbis without any reasons, went into the kitchen to take a knife and took the stairs to go into the bedroom.

326)    Louis-Alexandre Noel Albert Dalbis began to try to scratch his arm with the knife.

327)    Louis-Alexandre Noel Albert Dalbis described the feeling during the accomplishment of the gesture as he didn't understand the situation.

328)    And that, Louis-Alexandre Noel Albert Dalbis was also under the influence of advanced psychological manipulation for the accomplishment of the various steps of this action.

329)    And then, Louis-Alexandre noel albert Dalbis put back the knife in the kitchen.

330)     During the period when Louis-Alexandre Noel Albert Dalbis was enrolled in the restaurant Quick, at the huge commercial center of the city of Les-Ulis, Essonne, France.

331)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

332)     Louis-Alexandre noel albert Dalbis took a knife in the kitchen and put it into a briefcase and went to the city of Les-Ulis.

333)     After the day of work, Louis-Alexandre Noel Albert Dalbis left the restaurant to go to his car, parked next to the entrance of the restaurant.

334)     Louis-Alexandre Noel Albert Dalbis left the wrist of the knife outside the briefcase.

335)     Louis-Alexandre Noel Albert Dalbis passed in front the outside window of the C&A store located next to the restaurant Quick.

336)     Louis-Alexandre Noel Albert Dalbis was a victim of advanced psychological manipulation technique, guidance type, to assault with the knife a group of individuals who were robustly and standing in front of the ATM of the bank LCL.

337)     Louis-Alexandre Noel Albert Dalbis didn't assault the group of individuals.

338)     And then, a few seconds after, a police car passed by the parking in front of the ATM of the bank LCL.

339)     Then, Louis-Alexandre Noel Albert Dalbis went to his place of domicile at Gif-sur-Yvette.

340)     During the period when Louis-Alexandre Noel Albert Dalbis was enrolled in the restaurant Quick, at the huge commercial center of the city of Les-Ulis, Essonne, France.

341)     Louis-Alexandre Noel Albert Dalbis used a car to accomplish the route between his place of domicile at Gif-sur-Yvette to the restaurant Quick, located in the huge commercial center and now replaced by a restaurant Burger King.

342)     Louis-Alexandre Noel Albert Dalbis, was driving on the road Chemin-Vicinal-2, located in the city of Gif-sur-Yvette, in the district of Chevry-2.

343)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

344)     Before La-ferme-des-coteaux, Louis-Alexandre Noel Albert Dalbis was driving at a speed of approximately 50-70 kilometers, changing lanes to drive in the wrong traffic direction.

345)     At this moment a car was occupying the lane. Louis-Alexandre Noel Albert Dalbis returned in the initial lane and avoided a frontal impact narrowly.

346)     Louis-Alexandre noel albert Dalbis was close enough in front of the other car that he was able to see a young child sitting in a Baby car seat at the back of the other vehicle.

347)     Because of the facts that happened while Louis-Alexandre noel albert Dalbis was working at the restaurant Quick, he quit the employment at the restaurant.

348)     During the period when Louis-Alexandre noel albert Dalbis was enrolled in the FNAC storage center, located street Emile-Baudot, in the city of Massy-Palaiseau, Essonne, France.

349)     A student protest took place in the region of Paris, with extension to the city of Massy-Palaiseau. Students were crossing streets of the city of Massy-Palaiseau.

350)     At the end of the day of work, Louis-Alexandre noel albert Dalbis was driving his car on the avenue Emile-Baudot with the intention to return to the domicile at Gif-sur-Yvette.

351)     The plaintiff planned to use the avenue Emile-Baudot to go to the Train station of Massy-Palaiseau and took the road to reach the highway.

352)     In the avenue Emile-Baudot, the plaintiff saw on the avenue, at the level of the street Croix-de-Martre, a group of several dozen students who were walking in the opposite direction of his way.

353)     Louis-Alexandre noel albert Dalbis decided to turn left and cross the street Henri-Barbuse, with the objective to avoid the group of students

354)     The plaintiff knew that this way also allowed him to return to his place of domicile at Gif-sur-Yvette

355)     Louis-Alexandre noel albert Dalbis completed the turn to drive on the street Henri-Barbuse, he continued to go straight into this street.

356)     Brusquely, independently of his willingness, the plaintiff performed a half-turn and went back to the avenue Emile-Baudot, and placed the car in front of the student group.

357)    Louis-Alexandre noel albert Dalbis left the car in freewheel to the direction of the student group.

358)    The plaintiff didn't perform the gearshift incorporated by the use of advanced psychological manipulation techniques, which would significantly increase the speed of the vehicle

359)    The car passes through the group of students at a low speed, approximately 5 kilometers per hour, allowing a student to jump into the car hood, then jump on the car roof, and jump behind the car without damage.

360)    The plaintiff described that : he was staying rigid, the foot pushing into the clutch pedal, in a sort of state of shock, panic, where he didn't understand what happened and didn't know what to do.

361)    From 2010,  the period when Louis-Alexandre noel albert Dalbis was occupying the apartment in Paris. The plaintiff declare that various additional types of advanced psychological techniques were incorporated, in addition to advanced psychological manipulation techniques, guidance type.

362)    Louis-Alexandre noel albert Dalbis resided in an apartment in the city of Paris with his brother during the year 2010. And sometimes lived in the place of domicile at Gif-sur-Yvette

363)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

364)    The nursery school is located near the entrance of the apartment 's courtyard

365)    Louis-Alexandre Noel Albert Dalbis was in front of the door of the nursery school and was about to enter.

366)    And that, Louis-Alexandre Noel Albert Dalbis didn't accomplish this act after staying several dozen seconds in front of the door of the nursery school.

367)    During the stay at the apartment located in Paris, in 2010.

368)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

369)    Louis-Alexandre noel albert Dalbis went several times to the Bois-de-Boulogne, next to the city of Paris, France.

370)    This location is the place is occupied by male people who disguise themselves as women and perform tariffy sexual relations

371)    Louis-Alexandre noel albert Dalbis is not subject to sexual pulsion for male individuals disguised in women. The plaintiff  is subject to disgusting feeling by thinking having sexual relations with male individuals or male individuals disguised as women.

372)    The plaintiff walked  in the street where those sexual services are proposed, and made multiple back and forth in the street, and went also in the adjacent streets before paid male person disguised in women to perform sexual acts.

373)    Louis-Alexandre Noel Albert Dalbis went back to the apartment located in Paris.

374)    The plaintiff describe that : he was not interested, didn't understand the purpose of his presence. And that, didn't had the capabilities to take a decision, to demonstrate an initiative spirit to leave the place or consumed tariffy sexual relations.

375) During summer holidays 2010, Louis-Alexandre noel albert Dalbis passed the test to be registered in a school managed by the Pigier group, in the city of Jacou, near Montpellier, France.

376) In 2011, when Louis-Alexandre noel albert Dalbis came back to Montpellier, the technical training center was managed by the Idelca group. The plaintiff subscribe to a study course

377) Louis-Alexandre noel albert Dalbis stayed at the Youth Hostel in the center of Montpellier, rue-des-ecoles-laïques, during the beginning of the study course.

378) When he was a customer of this hostel. The plaintiff declare that he was under the influence of advanced psychological manipulation techniques to pass through from the window of the room and fall into the courtyard.

379) In the city of Montpellier, at the level of the crossroad between street Faubourg-de-Nimes and street Boulevard-Louis-Blanc, a car passed in front of him and the person sitting at the passenger seat mimicked the gesture of scratching his arm.

380) The plaintiff denounce a simulation of mental pathology: Paranoia or psychose

381) In the courtyard, safety barriers were placed just under the window of the room. And that, those safety barriers formed a circle.

382) Louis-Alexandre noel albert Dalbis because he was subject to vertigo was repulsed from the window.

383) Louis-Alexandre noel albert Dalbis encountered individuals and began to rent a room in a house, with the participation of one of them, for a period of one month.

384) The plaintiff decided to leave the city of Montpellier to come back to Paris, France. After few months of study course.

385) For the year 2012, Louis-Alexandre noel albert Dalbis subscribed to a technical training center in the city of Paris, street rue-des-reculettes, next the roundabout of Place-d'-italie.

386) Louis-Alexandre noel albert Dalbis followed this study course alternately with an internship in the attorney law office of his father.

387) The plaintiff went to the François-Mitterrand Library, located in the city of Paris, near the ministry of finance of France. And that, Louis-Alexandre noel albert Dalbis consulted the Islamic law, and various newspaper articles concerning sanction in relation with the Sharia.

388) Louis-Alexandre noel albert Dalbis finished to redact the manuscript with the information about the facts from 1996 to 2012.

389) After two years at the technical training center providing a study course in the real estate profession, Louis-Alexandre noel albert Dalbis didn't obtain the diploma.

390) In 2013, The plaintiff declare that he was under the influence of the advanced psychological manipulation techniques to redact the document delivered at the border authorities of the United States of America in 2015.

391) The plaintiff declare that he was under the influence of conditioning, to watch criminal cases documentary content. To generate delirium conduct and adhere simulation of reasoning.

392) Provoking the partial adhesion at the simulation of reasoning noticeable by the travel in Norway.

393) This document didn't include information concerning the period between 1996 to 2005 despite the information were available in the manuscript redacted before.

394) This document included information concerning a theory about the case Anders Breivik, Norway, seen on audiovisual contents.

395) After redacting the document with the writing software on his computer, The plaintiff solicited the bank advisor to apply for a bank loan of 2000 euros.

396) Louis-Alexandre noel albert Dalbis took a plane to go to the city of Osllo, Norway, with the document containing the theory on the Breivik case that occurred in Norway.

397) In the city of Oslo, Norway, The plaintiff photocopied documents and went to the PST facility located in Oslo, Norway, to drop the document in front of the building.

398)     In the metro, the plaintiff declare that he was under the influence of advanced psychological manipulation techniques, guidance type, to return to the PST facility and recover the document.

399)     Louis-Alexandre noel albert Dalbis went back to the hotel , and after few days took a plane to go back to France.

400)     The plaintiff was driving in the city of Paris, approximately after the Place-Blanche, In the street Boulevard-de-Clichy, in the direction of Place-de-Clichy, Paris, France,  on the sidewalk, a blond male individual was advancing from sidewalk to the road.

401)     The plaintiff declare that he perceived a simulation of reasoning concerning the case Breivik and denounce a simulation of psychiatric pathology : Paranoïa or Psychose

402)     During the period between 2013 to 2015, Louis-Alexandre noel albert Dalbis was on holiday with members of his family in the family farm property, located in the Centre-de-la-France.

403)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

404)     The plaintiff and members of his family were in the garden in front of the Main House. The plaintiff went inside the house, into the room where the Hunt rifles are stored.

405)     Louis-Alexandre noel albert Dalbis took a hunting rifle and aimed, through the window, at family members in the garden. The plaintiff  stayed a few minutes in this position.

406)     Members of his family went into the room by surprise. The plaintiff accomplished a half-turn with the hunting rifle and aimed at the family members who were entering into the room. The plaintiff  stopped aiming with the hunting rifle and aimed for the floor.

407)     The plaintiff declare  that, in more than 20 years, this type of situation never happened.

408)     During the period between 2013 to 2015, in the city of Les Ulis and in the city of Massy-Palaiseau.

409)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

410)     The plaintiff  presented himself to the recruitment center of the French army located in the city of Les-Ulis, and had an appointment, in the city of Massy-Palaiseau, with an recruitment officer

411) The plaintiff began the recruitment process that started with a background check. and received a letter from the recruitment center to indicate that the background check was validated.

412)     The recruitment officer proposed a work in the weather analysis to Louis-Alexandre noel albert Dalbis. Louis-Alexandre noel albert Dalbis declined the proposal because he believed that he was suffering mental illness.

413)     During the period between 2013 to 2015, Louis-Alexandre noel albert Dalbis frequented his half-brother at his place of domicile in the city of Bagneux, Ile-de-France, France.

414)     The plaintiff's half-brother domicile was located in a district of the city where there is social housing, drug trafficking, security problems, gang problems.

415)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

416)     The plaintiff went to the Champs-Elysees, Paris, to buy an electric self defense device.

417)     During a stay, Louis-Alexandre noel albert Dalbis asked his half-brother to shock him with  the electric self defense device.The plaintiff's half-brother refused to accomplish this action.

418)     Because the plaintiff believed that there was a device in his body.

419)    During the period between 2010 and 2013, the plaintiff resided at the place of domicile of his parents, at Gif-sur-Yvette.

420)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

421)    The plaintiff began to perform modifications to the Constitution of the European community.

422)    The plaintiff began to perform modification of the United States of America constitution to adapt it for the European Community.

423)    The plaintiff  wanted to send a video of modification of the Constitution to Gael Cottet, using the YouTube platform. Louis-Alexandre noel albert Dalbis didn't accomplish this action.

424)    Louis-Alexandre noel albert Dalbis sent an email to the Elysée, French Republic president email address, with the modification of constitutions.

425)    Several times after, The plaintiff wanted to deliver the document to the political party Les-Verts, and went to the city of Paris in a restaurant in front of the headquarters of the political party Les-Verts.

426)    After taking a cafe, Louis-Alexandre noel albert Dalbis left the place without giving any documents.

427)    The plaintiff declare that there is neither interest for him to perform those modifications

428)    The plaintiff declare that he was under conditioning to perform modifications and sending documents concerning changes at the president office in l'Elysée, by email, is a legitimate process.

429)    During the period between 2012 and 2015, Louis-Alexandre noel albert Dalbis resided at the place of domicile of his parents at Gif-sur-Yvette, Essonne, France.

430)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques.

431)    During a night, there was strong rain outside, with strong wind. The plaintiff took the car and went to the highway without any reason.

432)    Louis-Alexandre noel albert Dalbis driven at an excessive speed, to accomplish a swerve with aquaplaning to provoke a lost of adherence, at 180 kilometers per hour.

433)    Fortunately, the aquaplaning didn't work. And the plaintiff went back to his place of domicile.

434)    During the period between 2012 and 2015, Louis-Alexandre noel albert Dalbis resided in the place of domicile of his parents at Gif-sur-Yvette.

435)    During 2011 to 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

436)    The plaintiff declare that he was under conditioning, several times to make him believe that his situation was the result of actions of individuals in the street or individuals he knew the address of domiciliation, to generate hate against individuals.

437)    Conditioning, to make him believe that his psychological suffering will stop if he performed a crime against his parents or members of his family, unknown individuals, persons from ancient social networks.

438)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques. The plaintiff went into the kitchen to take a knife.

439)    Louis-Alexandre noel albert Dalbis endured psychological subjugation to perform an assault with the knife on his parents. Approximately two or three times during this period.

440)    The plaintiff didn't perform any assault.

441)    The plaintiff called and had an appointment with individuals. The plaintiff  didn't perform any physical assault or crime.

442)    During the period from 2010 to 2015, Louis-Alexandre Noel Albert Dalbis consumed illegal substances, cannabis type.

443)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

444)    Louis-Alexandre Noel Albert Dalbis went regularly in the city of Les-Ulis, Essonne, France to buy the illegal substances.

445)    In five years, the plaintiff was arrested one time by the police and warned with a reminder of the law.

446)    During the period from 2011, Louis-Alexandre Noel Albert Dalbis declare that he was under the influence advanced psychological manipulation techniques

447)    Conditioning, to generate needs and desires, verifiable with the internet historic and the testimony, with the objective to generate a sexual conduct of a sort of pervert.

448)    Louis-Alexandre noel  to feel sexual desires, to generate sexual excitations.

449)    The plaintiff  watched pornographic contents and masturbated himself, sometimes several times per day.

450)    During the period between 2012 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

451)    Louis-Alexandre Noel Albert Dalbis declare that he was under the influence of advanced psychological manipulation technique to buy a detector of radio signal, and use this detector in the house.

452)    During the period between 2010 and 2015,

453)    The plaintiff declare that he was under conditioning, to watch during hours, on YouTube and download contents concerning the use of firearms.

454)     Louis-Alexandre noel albert Dalbis declare that he was under the influence of advanced psychological manipulation techniques, to went to the shooting range of Versailles, Yvelines, France.

455)    The plaintiff parked his car in front of the facility. To begin training to use firearms, weapons, Louis-Alexandre noel albert Dalbis didn't accomplish anything.

456)    During the period between 2012 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.  The plaintiff  broke the television in the living room.

457)    The plaintiff declare that he was under advanced psychological manipulation techniques to make Louis-Alexandre noel albert Dalbis believe that there was a camera inside the television that filmed into the house.

458)    During the period between 2012 and 2015, Louis-Alexandre Noel Albert Dalbis resided in the place of domicile of his parents, at Gif-sur-Yvette.

459)    The Plaintiff declare that he was under the influence of an advanced psychological manipulation technique to cut the grass of the house's garden with a scissor.

460)    Louis-Alexandre Noel Albert Dalbis drew forms with the scissor, into the grass of the house's garden during several hours

461)    During the period between 2010 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

462)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques

463)     Louis-Alexandre noel albert Dalbis was using a laptop to consult his Facebook account and received a message from Gauthier Tardy on the topic of the period 2005-2006.

464)    Gauthier Tardy wanted to apologies concerning his conduct.

465)    Louis-Alexandre noel albert Dalbis declare that he prepared, calculated, everything to perform a stratagem that lead to the suicidal conduct of Mauve-Cécile Laurant

466)    The plaintiff declare that didn't have the knowledge, characteristics, capabilities, capacity, to perform psychological techniques to generate a suicidal conduct.

467)    Louis-Alexandre noel albert Dalbis knew that the suicidal conduct of Mauve-Cecile Laurant was false.

468)    During the period between 2013 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

469)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques to go to the city of Riga, Latvia.

470)    The plaintiff stayed a few days in the city of Riga, and went to the French Embassy to denounce the crime in which he was the victim.

471)    In front of the desk of the consular services, the Plaintiff redacted a incomprehensible document

472)    The employee of the consular office said that she will transfer to the competent services inside the Embassy, and Louis-Alexandre noel albert Dalbis left the place.

473)    Next to the MacDonald restaurant near the Embassy of France, the plaintiff heard through the loudspeaker only the name of Gauthier.

474)    A few days later, Louis-Alexandre Noel Albert Dalbis left the place by bus to go back to France.

475)    During the period between 2013 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

476)    The plaintiff declare that he was under the influence of advanced psychological manipulation techniques to go,without any reasons to the city of Suresnes, Hauts-de-Seine, île de France, France.

477)    The plaintiff parked his car in the street rue-victor-Hugo, next the hospital Foch-Franklin- Roosevelt, and walked from his car to the front of this hospital

478)    The plaintiff decided to went to his car to go back to the place of domicile at Gif-sur-Yvette

479)    Despite parking the car only 5 minutes ago in an adjacent street at approximately 3 minutes by foot, he was incapable of recovering his vehicle.

480)    The plaintiff was staying in the courtyard of the hospital, in a standing position for several minutes, feeling exacerbate sound, oppressive day light, and a sensation of dizziness.

481)    The plaintiff went to the police station of the city of Suresnes and asked  if his car was removed by the municipal pound.

482)     The policeman said that the car was not registered in the municipal pound files

483)    Louis-Alexandre noel albert Dalbis returned to the front of the hospital and went to the rue Victor-Hugo, finally found his car and went back home.

484)    The plaintiff declare that he never went to the security local or police station because he was not able to remember where his car was parked while he was shopping in a commercial center.

485)   During the period between 2010 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

486)   The plaintiff declare that conditioning provoked physiological consequences on his organism as follows : heart contractions, panic attack, suffocation, feeling of a panic with the necessity to go outside and walk to calm down because of a sort of tachycardia, malaise feeling, psychose feeling, vertigo, fainting.

487)   The plaintiff declare that the conditioning under a state of subjugation influenced his metabolism.

488)   Sometimes the plaintiff mind believed that conditioning was the product of his logic

489)   Sometimes only his corpse believed that the conditioning was the product of his logic and had physiological reactions.

490)   Conditioning to make him believe that he was not Louis-Alexandre noel albert Dalbis but replaced by another person who was subject of plastic surgery to be Louis-Alexandre noel albert Dalbis.

491)   Conditioning to make him believe that he was an ancient criminal who committed murder and condemned, and he was psychologically reconditioned into Louis-Alexandre noel albert Dalbis , to live another life.

492)   Conditioning to make him believe that his family members were not from his family but actors who played the role of members of his family.

493)   Conditioning to make him believe that their parents were in reality two women, and one of these women was wearing a suit to look like a male individual.

494)   Conditioning to make him believe that His mother was in reality Mauve-Cécile Laurant 30 years after , and that this one was maintained in state, hibernation, in  coma.

495)   Conditioning to persuade him that he was a clone of his grandfather, and that a transplantation was accomplished. And that the transplantation works, and that because it was not his original corpse, but a transplant, the medical procedure implies that he had to forget his past and believe he is Louis-Alexandre noel Albert Dalbis to prevent rejection.

496)   Conditioning to persuade that he was subject of hand transplant, chest transplant.

497)   Conditioning to persuade somebody came with a UV pen to draw mole on his skin, and when the moles are relying, they form a message, a symbol.

498)   During the period between 2013 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette. And that,

499)   The plaintiff declare that he was under the influence of conditioning, to make him believe in God, and adhere to Christianity.

500)   Louis-Alexandre noel albert Dalbis was persuaded of the existence of God.

501)   Louis-Alexandre noel albert Dalbis talked about his belief to members of his family.

502)   Louis-Alexandre noel albert Dalbis stop gradually to be persuaded of the existence of God because he was not stimulated by a targeted conditioning.

503)   During the period between 2013 to 2023, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

504)   The plaintiff declare that he was under conditioning, with the objective to falsify his potential future statement concerning the facts he was victim of.

505)   By simulating and implementing reasoning about facts and erroneous  interpretation of facts.

506)   For example the relation between the facts and the Breivik case, Norway.

507)   To persuade the Plaintiff  that some facts happened differently as his souvenir with the objective to discredit his statement

508)   Because of the stop of the targeted conditioning stimulation, the plaintiff didn't adhere to conditioning.

509)     During the period between 2010 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette.

510)     The plaintiff declare that he was under the influence of advanced psychological manipulation technique and conditioning to adopt a conduct irritable, disrespectful with family members and third persons.

511) And speaking through, on the behalf of the plaintiff during his interaction with members of his family and others.

512)     Several times, the plaintiff quarreled with members of his family without any reasons, on subjects that weren't usually a problem.

513)     For example, the plaintiff withdrew 600 euros with the credit card of his brother at an ATM, while he was not in a difficult financial situation.

514)     In 20 years, the plaintiff never took money from his brother by using his credit card and this situation was a cause of quarrel.

515)     During the period between 2010 and 2015, the plaintiff declare that he was under the influence of simulation of mental pathology.

516)     By making the plaintiff talking alone in the place of domicile at Gif-sur-Yvette, and in various public places or various situations with the presence of third persons

517)     The plaintiff declare that, during this period, he was under the influence of simulated discussions or dialogues, to make appear speaking alone

518)     The plaintiff declare that, during this period, he wasn't at the origin of the dialogues.

519)     During the period between 2011 to 2023, the plaintiff declare that he was under the influence of simulation of psychiatric pathology, to persuade him that he suffered mental disorder

520)     The plaintiff took an appointment with a doctor and talked about the fact that he was potentially under the influence of a device.

521)     The practitioner redacted a prescription to pass radiology and scanner to determine the presence of a foreign corpse in his body.

522)     The plaintiff passed the radiology and scanner. The diagnosis established that there is no foreign corpse in the body. The plaintiff believed that he was insane.

523)     Louis-Alexandre noel albert Dalbis consulted Psychiatrist and psychologist who affirmed that he suffered a mental disorder.

524)     Despite the fact that Louis-Alexandre noel albert Dalbis began to talk about the sequence of the criminal facts and stipulated that he was approached by a female individual who claimed to be affiliated with the activity sector of security and intelligence services of France.

525)     Louis-Alexandre noel albert Dalbis stipulated that his relationship with Mauve-Cecile Laurant went wrong, and emitted the hypothesis of reprisal against him.

526)     The plaintiff began to expose the situation from 2005 to 2010, in front of the psychiatrist of the Orsay-hospital.

527)     Despite that, the beginning of the explanation was understandable. The plaintiff was incapacitated to finish his demonstration.

528)     The psychiatrist and psychologist didn't ask additional questions concerning the facts, and established a diagnosis based on their own interpretation of the situation without having verified or taking in consideration his allegations.

529)     Louis-Alexandre noel albert Dalbis began to believe that he was suffering from a mental disorder and that he will have to live with this handicap during his life.

530)     During the period between 2010 and 2015, Louis-Alexandre Noel Albert Dalbis resided at the place of domicile of his parents, at Gif-sur-Yvette, or other place.

531)     The plaintiff declare that he was under the influence of psychological deconstruction, to provoke insomniac conduct, sleep deprivation that kept him in a state of continuous somnolence and psychological subjugation.

532)     The plaintiff was not capable of taking the advantage on the situation, took initiative.

533)     During nights, the Plaintiff was not able to sleep because the continuing use of this type of techniques to solicit his brain in a subconscious manner.

534)     The plaintiff describe a sort of psychological inhibition

535)     During the period between 2011 and 2015, during a night a night, the Plaintiff was sleeping.

536)     Without being able to wake up, to move, the Plaintiff felt a pressure at the level of his heart and the pressure became more intense.

537)     When the pressure began to be painful, the plaintiff perceived this sentence in french : "death in all her splendor",

538)     In a state of a sort of conscious sleeping, Louis-Alexandre noel albert Dalbis moved to the left and the pain stopped.

539)     During the period between 2011 to 2015, a night the Plaintiff was sleeping and reached a sort of state of conscious sleeping.

540)     Louis-Alexandre noel albert Dalbis was not able to perform movement with his arm, legs, and other parts of his corpse despite the willingness to accomplish movement.

541)     The plaintiff was not able to open his mouth, and his eyes.

542)     Conscious of his total paralysis state, the plaintiff began to scream without opening his mouth for long seconds. And the Plaintiff thought that he was fainting.

543)     During the period between 2011 to 2015, during a night, the plaintiff was sleeping and reached a sort of state of conscious sleeping.

544)     The plaintiff perceived that he was positioned on his knee, with the chest in contact with the mattress. And had a sort of screen behind his eyes on which to scroll sentences in a language that he can't understand.

545)     The plaintiff heard and partially felt that something was hitting the back of his legs with repetition. And heard a long vocal expression of a male person who is accomplishing a forced sport effort.

546)     The plaintiff was not able to perceive sensation from other parts of his body.

547)     During a night, Louis-Alexandre Noel Albert Dalbis was sleeping in the Red nose hostel in the city of Riga, Latvia.

548)     In the same dormitory, was a person who claimed to be an employee of Public institution.

549)     The plaintiff reached a sort of state of conscious sleeping, and perceived that something was butchering the skin of his back. Louis-Alexandre Noel Albert Dalbis didn't have the possibility to wake up or move.

550)     During the year 2015, Louis-Alexandre noel albert Dalbis filed an ESTA document to be able to travel from France to the United States of America without requesting a VISA.

551)     The plaintiff declare that he was under the influence under of advanced psychological manipulation techniques

552)     The plaintiff had to fill the part of the document concerning his criminal records, police records, background.

553)     Louis-Alexandre noel albert Dalbis previously requested and received his official criminal records number 3 where nothing was recorded, without mentions concerning the reminder of the law for illegal possession of marijuana.

554)     Under the state of psychological subjugation that urged him to tick the boxes that he wasn't being arrested by local authorities, he took a long part of the day to fill the ESTA document.

555)     Despite the use of advanced psychological manipulation techniques, the plaintiff ticked that he has been arrested by the authority, and didn't perform a perjury.

556)     Because he didn't made a perjury on the ESTA, he had to fill a request for a VISA, and planned an appointment with the consular services of the Embassy of the United States of America in Paris, France, in weeks.

557)     The plaintiff filed the document without the intention to make a perjury or involuntary omission.

558)     Because of the state of subjugation, the Plaintiff believe that he made a mistake on the translation of some questions and gave additional information that wasn't needed by the administration of the United States of America.

559)     in 2015, between the obtention of an appointment at the Embassy of the United States of America in Paris and the date, the day, of the appointment at the Embassy's facility.

560)     The plaintiff declare that he was under the influence of advanced psychological manipulation techniques to go to the city of Den Haag, located in the Netherlands.

561)     After the stay, during the way from Den Haag, Netherlands, to Paris, France, in the highway, in the Netherlands territory, the plaintiff was driving the car at approximately 130 kilometers per hour.

562)     A truck made a swerve, a lurch, to collide with his car after cutting the trajectory of his vehicle while he was overtaking the truck by the left.

563)     Louis-Alexandre noel albert Dalbis described the facts by the following manner : he was engaged at the level of the truck trailer, and saw the driver's cab on the lane he was driving. The plaintiff changed the trajectory at the last time, because of the rapidity of the actions, and the car nearly passed just across the driver's cab, few centimeters.

564)     The Plaintiff declare that he was under the influence of advanced psychological manipulation techniques to go to the city of Den Haag by car to do nothing during the stay.

565)     In 2015, the Plaintiff went to the appointment at the Embassy of the United States of America to request a VISA.

566)     Louis-Alexandre noel albert Dalbis didn't try to use subterfuge to obtain the possibility to travel in the United States of America territory, he didn't furnish the necessary elements to the consular officer to obtain a VISA.

567)   In 2015, after the appointment at the United States of America 's Embassy, Louis-Alexandre noel Albert filled an authorization of travel with the government of Canada

568)   The authorization was approved by the Canadian public services. Then the plaintiff went to Canada by plane, at the airport of Montreal.

569)   The Plaintiff took a bus from Montreal to go to the border between the Canadian territory and the United States of America territory.

570)   The Plaintiff presented himself to the border authorities at the document control checkpoint at the frontier, to request asylum status and delivered the document describing the facts from 2005 to 2014, without mentioning the content described in the manuscript.

571)   The plaintiff declare that he didn't mention the facts that happened before 2005 and described in the manuscript independently of his willingness.

572)   The plaintiff was transferred to a jail in the city of Clinton, New-York, United States of America, and was transferred to the federal jail of the city of Buffalo, New-York.

573)   The plaintiff waited  approximately one month to have a hearing at the immigration court of Buffalo. During the hearing, the plaintiff was confused enough to reach the wrong hand for the swearing.

574)   Withdrew the asylum application and was removed from the United States of America territory for a period of ten years.

575)   The Plaintiff declare that he didn't furnish false information with the objective to use subterfuge considered as perjury to obtain the asylum status.

576)   The plaintiff was removal to Canada and went back to France

577)   From 2016, the plaintiff stayed in the domicile of his parents and went to the domicile of his cousins located at Mantes-la-Jolie, Yvelines, France, for months.

578)   The plaintiff went back to Canada territory and applied for asylum at the airport of Montreal.

579)   The asylum request was denied and the plaintiff was removed to Europe.

580)   From 2016, The plaintiff declare that he was under the influence of advanced psychological manipulation techniques to subscribe to organized travel with UCPA association in the South of France and in Bombanne, near Bordeaux, France.

581)   Also, the plaintiff declare that he was under the influence of psychological manipulation techniques to subscribe to an adult study course in agricultural management in Orleans.

582)   And lived in a rented apartment in Orleans during the time of the study course.

583)   The plaintiff went to the police station of Orleans to partially denounce the criminals facts

584)   The plaintiff went to the Court of Orleans to denounce the criminal facts

585)   Those two solicitations stayed without any consequences.

586)   The Plaintiff didn't obtain the diploma in agricultural management and subscribe in another similar study course in the city of Chartres, France.

587)   The plaintiff finally obtained the diploma in agricultural management and solicited the official status of self- entrepreneur.

588)   Louis-Alexandre noel albert Dalbis worked for the agricultural company managed by a member of his family, during holidays, and then, as an external employee.

589)    From 2016, the plaintiff declare that he was under the influence of advanced psychological manipulation techniques to go to the hospital of Paris, in the emergency service, located Boulevard-de-L'hôpital, Paris.

590)    During the interview with the psychiatrist, the plaintiff didn't furnish the phone number of a person who was able to come get him. And the doctor initiates the procedure of health under constraint.

591)    The Plaintiff was transferred to the Orsay hospital. And stayed in the psychiatric service for one month in observation, after a judicial decision emitted by the jurisdiction of Evry.

592)    Despite the facts that the Plaintiff evoked the facts that occurred in the pedestrian way when he was under the legal age of majority in front of a court.

593)    After a month of observation at the hospital, the psychiatrist established a diagnosis that the plaintiff was able to follow the health care outside the hospital, and didn't diagnose a mental disorder corresponding to the facts.

594)    The team of professionals in psychology and psychiatry performed the same diagnosis again with an obligation to take a cocktail of medicines.

595)     In the city of Orleans, France. The plaintiff  was following health care at the psychology center during a year in parallel with the adult study course. The Plaintiff continued to took medicines.

596)    In 2019, the Plaintiff redacted a document containing all the facts from before 1996 to 2016. And send this document to governmental organizations.

597)    Despite his sollicitation neither governmental organizations answered.

598)    From 2019, the Plaintiff declare that he was under the influence of advanced psychological manipulation techniques performed to obtain information concerning constitutive elements of criminal facts.

599)    Despite of sollicitation the Plaintiff didn't have any serious interviews to clarify the situations, with official representatives of government authorities, would have taken 24 hours to 48 hours and allowed the intention of a judiciary to proceed investigations  and interrogate protagonists, but no further action was decided.

600)    Various governmental  institutions reject the request of Louis-Alexandre noel

601)    The plaintiff declare that he was under the use of advanced psychological manipulation techniques to evaluate correctly if it would be possible to falsify the truth concerning the sequence of criminal events related in the document.

602)    From 2016, the plaintiff declare that he was under the influence of advanced psychological manipulation techniques to profit of a state of subjugation to make him spend his money for accomplishing tariffy sexual acts.

603)    From 2019,  the plaintiff declare that he was under the influence of advanced psychological manipulation techniques to destabilize by using death threats, several times.

604)    By trying to persuade the Plaintiff  that the case will not be resolved,  he will have to resign himself to endure without any possibility of obtaining consideration for his requests.

605)    By trying to persuade the plaintiff  that his demonstration, reasoning, and elements of evidence are not valuable in front of a judicial institution.

606)    By trying to persuade him that he committed illegal actions to prevent him to began legal procedure. For example the fact occurred in Paris and involving Mauve-Cecile Laurant, but refused to use legal mentions to characterize precisely the events.

607)    By editing a false profile of the plaintiff by profiting from the state of subjugation to manipulate the history internet linked to his person. For consulted internet websites in relation with female escort services by a recurrent, often, constant manner.

608)    By trying  to make him redact aberrant conclusion or statement by trying to make him adhere to a sort of conspiracy theory

609)   From 2019, the plaintiff declare that he was under the influence of disinformation techniques to make it appear, that the situation is funny, that they are friend, helping the plaintiff , and are simply discussing various topics, science, video games, philosophy, humor.

610)   In 2022, the plaintiff went to the border between Mexico and United States of America territory, at the city of Nuevo-Laredo, Mexico, to apply for asylum request.

611) The request for asylum was rejected and the plaintiff went back to France.

612)   The plaintiff declare that something changed brusquely.

613)   The plaintiff began to initiate legal procedure in France, his request was rejected

614)   The plaintiff began to initiate proceedings at the international Penal Court of Den Haag, his request was rejected.

615)   The plaintiff began to initiate proceedings at the Court of Frankfurt Am Main, and had an interview with a police officer, who told him to rewrite the initial document.

616)   It was the first time since 2019, that an official representative asked him to rewrite the document.

617)   In Frankfurt Am Main, his request was rejected.

618)   The plaintiff went to Berlin, Germany to file a complaint, and had interviews with a psychologist and psychiatrist who accomplished the same work as French.

619)   And refused to compare the facts to the psychological profile of the plaintiff.

620)   In November 2023, the plaintiff went again to the border between Mexico and the United States of America territory at Nuevo Laredo.

621)   The plaintiff applied for asylum under the number 208361028.

622)   The plaintiff had two hearings at the immigration court of Laredo.

623)   The plaintiff is now filing a civil lawsuit against France under the Torture Victim protection Act of 1991-1992.

Dated : 07/29/2024

Dalbis Louis-Alexandre noel albert
The plaintiff

<u>**VERIFICATION**</u>

*Dalbis Louis-Alexandre noel albert , being duly sworn, deposes and says:*
*I am the plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.*
*The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief*
*and as to those matters I believe them to be true.*

Signature:

Dalbis Louis-Alexandre noel albert